No. 14-1128

# In the
# United States Court of Appeals
## for the Seventh Circuit

LESLIE S. KLINGER,

*Plaintiff-Appellee,*

v.

CONAN DOYLE ESTATE LTD.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:13-cv-01226,
the Honorable **Rubén Castillo**, Chief Judge, presiding.

BRIEF OF DEFENDANT-APPELLANT CONAN DOYLE ESTATE LTD.


William F. Zieske
ZIESKE LAW / FINE ARTS LEGAL
123 S. Eastwood Drive
Suite 222
Woodstock, Illinois 60098
Telephone: (312) 252-9599
Facsimile: (312) 278-0955

*Counsel for Appellant*
*Conan Doyle Estate Ltd.*

Benjamin Allison
SUTIN THAYER & BROWNE
A Professional Corporation
317 Paseo de Peralta
Santa Fe, New Mexico 87501
Telephone: (505) 988-5521
Facsimile: (505) 982-5297

*Counsel of Record for Appellant*
*Conan Doyle Estate Ltd.*


ORAL ARGUMENT REQUESTED


COUNSEL PRESS · (866) 703-9373

PRINTED ON RECYCLED PAPER

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 14-1128

Short Caption: LESLIE S. KLINGER v. CONAN DOYLE ESTATE LTD.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Conan Doyle Estate Ltd.

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Benjamin Allison, Sutin Thayer & Browne, APC, P. O. Box 2187, Santa Fe, NM 87504-2187

William F. Zieske (#6244180), 123 S. Eastwood Drive #222 Woodstock, Illinois 60098

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Date: January 23, 2014

Attorney's Printed Name: Benjamin Allison

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes X No ____

Address: P. O. Box 2187, Santa Fe, NM 87504-2187

Phone Number: (505) 988-5521 Fax Number: (505) 855-9510

E-Mail Address: bwa@sutinfirm.com

rev. 01/08 AK

TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT .................................... i

TABLE OF AUTHORITIES ........................................................................ iv

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF THE ISSUES .................................................................. 2

STATEMENT OF THE CASE ..................................................................... 3

SUMMARY OF ARGUMENT ...................................................................... 15

ARGUMENT .............................................................................................. 17

I STANDARD OF REVIEW ........................................................... 17

II DISTINCTLY DELINEATED CHARACTERS HAVE THEIR OWN COPYRIGHTS INDEPENDENT OF THE STORIES IN WHICH THEY APPEAR ........................................................ 18

A. Fictional Character Copyrights Have Strong Protection ........................................................ 20

B. Realistic Characters Are Often Created Over a Series of Stories ........................................... 21

C. The Factual Record on Creation of the Holmes and Watson Characters ................................... 24

D. The District Court Erred in its Assumption the Canon Consists of 59 Derivative Works All Recasting the First ......................... 27

1. No Court Has Ever Decided that in an Original Author's Own Series of Works Creating a Complex Literary Character, Works After the First Are Derivative Works ............................................................. 30

2. *Silverman* Was Correctly Decided for Flat Characters, But Should Not Control Complex Literary Characters ... 32

3. *Pannonia Farms* Offered a Dictum Without Benefit of Factual or Legal Development or the Proper Parties ... 36

4. Professor Nimmer's View Was Based on Faulty Reasoning ... 37

III THE DISTRICT COURT'S DECISION OFFERS NO WORKABLE STANDARD FOR FUTURE CASES ... 39

IV WORKS AT THE CORE OF INTENDED COPYRIGHT PROTECTION SHOULD NOT RECEIVE DIMINISHED PROTECTION ... 42

V THE DISTRICT COURT SHOULD HAVE DISMISSED THE CASE FOR LACK OF SUBJECT MATTER JURISDICTION ... 43

A. The District Court Erred in Deciding an Actual Case or Controversy Existed at the Time Mr. Klinger Filed this Action ... 43

B. The District Court Should Have Declined Jurisdiction for Prudential Reasons ... 48

CONCLUSION ... 50

## TABLE OF AUTHORITIES

<u>CASES</u>

*Alcan Aluminum Ltd. v. Dep't of Revenue of Oregon,*
724 F.2d 1294 (7th Cir. 1984)....................48-49

*Alvarez v. Smith,*
558 U.S. 87 (2009)....................44

*Anderson v. Stallone,*
No. 87-0592 WDKGX, 1989 WL 206431 (C.D. Cal. 1989)....................22, 40

*Azaria v. Bierko,*
No. 2:12-CV-09732-GAF-RZ, (C.D. Cal. Feb. 21, 2014)....................19

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
683 F.2d 610 (2d Cir. 1982)....................*passim*

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994)....................20, 21

*Cardinal Chem. Co. v. Morton Int'l, Inc.,*
508 U.S. 83 (1993)....................44

*CBS, Inc. v. DeCosta,*
377 F.2d 315 (1st Cir. 1967)....................39

*Eldred v. Ashcroft,*
537 U.S. 186 (2003)....................43

*Feist Publ'ns Inc. v. Rural Tel. Serv. Co.,*
499 U.S. 340 (1991)....................20

*Filmvideo Releasing Corp. v. Hastings,*
509 F. Supp. 60 (S.D.N.Y.)
*modified*, 668 F.2d 91 (2d Cir. 1981)....................22, 24, 32, 37

*Gaiman v. McFarlane,*
360 F.3d 644 (7th Cir. 2004)....................18, 20, 21, 33

*Gantz v. Hercules Pub. Corp.,*
182 N.Y.S.2d 450 (N.Y. Sup. Ct. 1959)....................39

*Grant v. Kellogg Co.*,
58 F. Supp. 48 (S.D.N.Y. 1944) ....................................................................39

*Harper & Row, Publishers, Inc v. Nation Enters.*,
471 U.S. 539 (1985)..........................................................................................43

*Jim Henson Prods., Inc. v. John T. Brady & Assocs.*,
16 F. Supp. 2d 259 (S.D.N.Y. 1997) ......................................................22, 37

*Kurlan v. CBS, Inc.*,
256 P.2d 962 (Cal. 1953)....................................................................................38

*McGraw-Edison Co. v. Walt Disney Prods.*,
787 F.2d 1163 (7th Cir. 1986)...................................................................17, 26

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ...............................................................................44, 48

*Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.*,
900 F. Supp. 1287 (C.D. Cal. 1995).....................................................*passim*

*New Line Cinema Corp. v. Bertlesman Music Group*,
693 F. Supp. 1517 (S.D.N.Y. 1988) ......................................................22, 37

*Nichols v. Universal Pictures Corp.*,
45 F.2d 119 (2d Cir. 1930)...........................................................18, 25, 26

*Pannonia Farms, Inc. v. USA Cable,* No. 03-7841,
2004 WL 1276842 (S.D.N.Y. June 8, 2004) ..........................................32, 36

*Pickett v. Prince*,
207 F.3d 402 (7th Cir. 2000)..........................................................................31

*Rice v. Fox Broadcasting Co.*,
330 F.3d 1170 (9th Cir. 2003)........................................................................18

*Salinger v. Colting*,
641 F. Supp. 2d 250 (S.D.N.Y. 2009) ....................................................19, 37

*Saturday Evening Post Co. v. Rumbleseat Press, Inc.*,
816 F.2d 1191 (7th Cir. 1987).........................................................................31

*Schrock v. Learning Curve Int'l*,
586 F.3d 513 (7th Cir. 2009)..........................................................................31

*Sears, Roebuck & Co. v. American Mut. Liab. Ins. Co.*,
372 F.2d 435 (7th Cir. 1967)....................................................................49

*Seng-Tiong Ho v. Taflove*,
648 F.3d 489 (7th Cir. 2011)....................................................................17

*Siegel v. Warner Bros. Entm't Inc.*,
690 F. Supp. 2d 1048 (C.D. Cal. 2009)........................................................34

*Silverman v. CBS, Inc.*,
870 F.2d 40 (2d Cir. 1989)................................................................*passim*

*Stewart v. Abend*,
495 U.S. 207 (1990)..........................................................................20, 42, 43

*Suntrust Bank v. Houghton Mifflin Co.*,
268 F.3d 1257 (11th Cir. 2001)..................................................................18

*U.S. Dept. of the Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.*,
475 B.R. 347 (S.D.N.Y. 2012) ....................................................................44

*Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*,
890 F. Supp. 2d 398 (S.D.N.Y. 2012) ...................................................44, 48

*Village of DePue v. Exxon Mobile Corp.*,
537 F.3d 775 (7th Cir. 2008)....................................................................17

*Walt Disney Prods. v. Air Pirates*,
581 F.2d 751 (9th Cir. 1978)....................................................................19

*Warner Bros. Entm't, Inc. v. X One X Prods.*,
644 F.3d 584 (8th Cir. 2011)....................................................................35

*Warner Bros., Inc. v. ABC, Inc.*,
720 F.2d 231 (2d Cir. 1983) ...............................................................22, 37

*Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc.*,
216 F.2d 945 (9th Cir. 1954)....................................................................33

STATUTES

17 U.S.C. § 101 (2006) [Copyright Act] ....................................................1, 31

17 U.S.C. § 408(c)(1) (2006) [Copyright Act] ................................................21

28 U.S.C. § 1291 (2006) [Appellate Jurisdiction]............................................2

28 U.S.C. § 2201 (2006) [Declaratory Judgment Act] ....................................1

TREATISES

*Goldstein on Copyright,* § 2.7.2 (2014)....................................................20, 25

*Nimmer on Copyright,* § 2.12 (2013)...........................................32, 37, 38, 39

*Patry on Copyright* § 3:164 (2014) .................................................................21

OTHER AUTHORITIES

Register of Copyrights, Copyright Law Revision,
87th Cong., 1st Sess., 6 (Comm. Print 1961)................................................43

## JURISDICTIONAL STATEMENT

Appellee Leslie Klinger invoked the jurisdiction of the district court under the Copyright Act, 17 U.S.C. § 101 *et seq*. (2006), and the Declaratory Judgment Act, 28 U.S.C. § 2201 (2006). As to the relief Mr. Klinger has requested, however, no case or controversy exists under Article III of the Constitution. Mr. Klinger alleges he suffered injury when his publisher refused to finalize a contract to publish his collection of unauthorized Sherlock Holmes stories after Conan Doyle Estate Ltd. (Conan Doyle) informed the publisher that a license would be necessary. Mr. Klinger acknowledges that Conan Doyle owns copyrights in ten Sherlock Holmes stories, but claims his book will not infringe those copyrights.

Mr. Klinger did not, however, submit his book to the court for resolution of the actual dispute: whether his book's use of the literary characters Sherlock Holmes and Dr. Watson, or any other protected material, infringes Conan Doyle's copyrights. Nor did Mr. Klinger offer the district court any of Conan Doyle's copyrighted works. Instead Mr. Klinger created a list of "Sherlock Holmes Story Elements," which are mere ideas segregated from the rich expression in Arthur Conan Doyle's work. A declaratory judgment regarding Mr. Klinger's list cannot resolve the actual controversy between these parties—whether Mr. Klinger is entitled to publish his book, *In the Company of Sherlock Holmes*, without a license. Instead, the declaratory judgment on Mr. Klinger's complaint provides an

advisory opinion on a list of abstract ideas which will result in piecemeal litigation. The question whether the book actually infringes Conan Doyle's existing copyrights remains to be decided. Jurisdiction should accordingly have been declined. Conan Doyle challenged the district court's jurisdiction below and now appeals the district court's decision to exercise jurisdiction.

This appeal is from a final judgment entered by the district court on December 23, 2013. Conan Doyle timely filed its Notice of Appeal on January 21, 2014. This court has jurisdiction under 28 U.S.C. § 1291 (2006).

## STATEMENT OF THE ISSUES

1. When a complex literary character is created throughout an original series of works, and early stories in the series have fallen into the public domain but the fully-realized and developed character is revealed only in later copyrighted works, does copyright law protect that character for a full copyright term running from the character's completion?

2. Is there any way to protect an author's final development of a complex literary character in copyrighted stories other than to protect the character in its entirety?

3. Did the district court properly exercise subject matter jurisdiction over this declaratory judgment action, where Mr. Klinger's claim is that his book was refused publication because of concern that it infringed Conan Doyle's copyrights, but Mr. Klinger has failed to place that infringement issue before the court for resolution?

## STATEMENT OF THE CASE

Sherlock Holmes and Dr. John H. Watson are among the most recognized and loved characters in modern literature. A. 27; R. 77.[1] They were created by Sir Arthur Conan Doyle over four novels and fifty-six short stories published in the United States between 1887 and 1927, often referred to as the Canon. R. 105. The last ten of these short stories contain the fully-developed characters of Holmes and Watson. R. 125; A.28. These ten stories were published in 1923 or after, and the parties agree that they remain under United States copyright protection for approximately nine more years, until December 31, 2022. R. 20, 108. We refer to these copyrighted stories as the Ten Stories.

Appellant Conan Doyle was formed by the family of the author to manage and license the literary rights in his work. A. 27. Conan Doyle licenses the rights for a variety of well-liked books, movies, television programs, and other uses. R. 79, 123. Although Mr. Klinger's district court briefing refers to this licensing as "bullying," and asserts that "authors, publishers, and producers have elected to yield to these demands rather than take on the burden of litigating," (R. 87, 79) these insinuations are without benefit of any factual support, and beg the question presented to this Court to answer.

[1] Citations to the record are in the form "R. __." Citations to the attached appendix submitted with Conan Doyle's brief are in the form "A. __."

Mr. Klinger asserts that some of the original stories and novels about Sherlock Holmes are in the public domain, and that is true. Based on that fact, however, Mr. Klinger presented the district court with a list of "Sherlock Holmes Story Elements" and asked for a declaration that his listed story elements, many of which contain partial descriptions of Holmes and Watson, are in the public domain. A. 25–26.

But there is more in Arthur Conan Doyle's work than story elements. His stories contain two richly delineated characters. A. 28. And characters—as Mr. Klinger omitted to acknowledge in his lawsuit—are protected by copyright independently of the stories in which they appear. Holmes and Watson as characters were continuously developed throughout the Canon. A. 27–28. While their early development occurs in public domain stories, the complete, fully-realized Holmes and Watson characters are revealed only in the copyrighted Ten Stories. A. 28.

It is the Ten Stories that reveal, for example, that Holmes's personality has mellowed, and that he becomes more emotional. A. 29. The Ten Stories reveal that Holmes has medical and other skills that were not revealed before. A. 30. And the Ten Stories reveal that the relationship between Holmes and Watson has been developing—from mere flat-mates in early stories to now very close friends. A. 29. Other character development in the Ten Stories is detailed below. But the Ten Stories do not simply present the two fictional characters as older men; the stories are set at

various points earlier in the two men's lives—so at nearly any point in their fictional lives, the characters depend upon creative contributions in the Ten Stories. A. 28.

In 2011 Plaintiff Leslie Klinger invited a group of contemporary writers to write new stories using Holmes, Watson, and other elements from the Canon. R. 121–23. Conan Doyle's literary agent informed Mr. Klinger he would need a license to use the Holmes and Watson characters. *Id.* Mr. Klinger claimed he could use the characters without intruding into the Ten Stories. But his publisher, Random House, disagreed and entered into a $5,000 license agreement with Conan Doyle for the book, titled *A Study in Sherlock*. In addition to using the complete Holmes and Watson characters, the published book used a number of plots, settings, and other elements from the Ten Stories. *Id.*

Conan Doyle discovered that Mr. Klinger was planning a sequel when one of the invited contributors informed Conan Doyle that he wished to use one of the Canon's fictional characters created entirely in a copyrighted 1926 story. A. 35. Conan Doyle wrote to Mr. Klinger and the proposed publisher of his unauthorized sequel, stating that a license on the same terms would again be necessary, and reminding them that Conan Doyle routinely polices online retailers selling unauthorized works. *Id.*

Mr. Klinger again claimed his book would not infringe. R. 24. Conan Doyle has never disputed that everything in pre-1923 public domain stories

is free for all to use except the Holmes and Watson characters, which are works of authorship substantially completed in the Ten Stories—and therefore protected by copyrights for 95 years from their completion, or December 31, 2022.

After Conan Doyle's demand, the publisher refused to finalize Mr. Klinger's publishing contract, and Mr. Klinger alleges he was thereby injured. R. 24–25. But rather than ask for a declaratory judgment to determine whether his derivative work infringes Conan Doyle's copyrights, Mr. Klinger offered the district court only a list of "story elements." A. 25. The list does not overtly include Holmes's and Watson's characters, but refers to them with lists of traits reduced to the level of bare ideas: *e.g.,* "Bohemian nature," "Loner," "Smoking," and "Patriotic." A. 25–26. Mr. Klinger asked the court to rule on his list, apart from the fully-realized character Arthur Conan Doyle created and expressed in his works. R. 27. It is a basic principle that copyright law protects not ideas but expression, yet Mr. Klinger offered the district court neither Arthur Conan Doyle's actual expression nor his own.

Given the modest licensing fee at issue, however, Conan Doyle allowed a default to be entered so that Mr. Klinger could publish his book without the default judgment having preclusive effect. R. 51. Mr. Klinger declined a default judgment and requested summary judgment, offering

additional facts through declarations stating that Holmes and Watson as characters were essentially created in pre-1923 stories. R. 57, 77–78.

The district court invited Conan Doyle to respond. R. 89. Conan Doyle submitted affidavits from three Sherlock Holmes experts delineating the stories in which Holmes's and Watson's characters were created. R. 139, 143, 147. Together with two literary character experts (R. 156, 179), they testified that Arthur Conan Doyle did not create derivative or variant versions of Holmes's character as he wrote each new story, but rather created one single complex character throughout the Canon—the character completed in the Ten Stories and known to the world as Sherlock Holmes. *Id.*

The district court ignored this factual dispute, however, and looked only at Mr. Klinger's list of abstract story elements. A. 21. At the same time, the district court stated it was not addressing whether the Holmes and Watson characters are protected by copyright (A. 21 n.8), or the fact question of when and where those characters were created. *Id.* The district court also relied on inapposite authority to call all the stories and novels of the Canon derivative works of the first, thus holding that Holmes and Watson were fully created in the first work of the Canon and dictating that later character development could simply be detached. A. 20.

The question of duration of copyright protection for characters created in multiple stories or novels is resolved under the 1976 Copyright

Act, because the copyrights in all of a writer's works now expire at the same moment seventy years after the author's death. But under the 1909 Act, copyrights expire a certain number of years after the publication of each work—posing the question presented in this case: will a complex 1909 Act literary character created over an original series of works be protected for a full copyright term from the character's completion? Or can a single complex character be continually pulled apart as each story creating that character falls into the public domain?

In its response to Mr. Klinger's motion for summary judgment, Conan Doyle presented affidavits from three Sherlock Holmes experts:

• Jon Lellenberg, award-winning author of five biographical books on Sir Arthur Conan Doyle and twenty-two books on Sherlock Holmes and the mystery and thriller genre; named by Mr. Klinger in widely published book as one of his mentors. R. 139–40.

• Loren Estleman, editor of Bantam Books' *Complete Sherlock Holmes*, in print since 1986; award-winning author of nearly seventy novels and works of nonfiction, including books on Sherlock Holmes; author and contributor to several books on writing detective fiction, including *Writing the Popular Novel* (2004), *Writing Mystery and Crime Fiction* (2012), *Writing the Private Eye Novel* (1997), and *Writing Mysteries* (2002). R. 143–44.

• H. George Fletcher, widely-recognized authority and writer on the Sherlock Holmes stories; head of scholarly Sherlock Holmes society founded in New York in 1935 and called by Baker Street Irregulars founder "Sherlockiana's Institute of Higher Studies"; retired Director of Special Collections of the New York Public Library, formerly Astor Curator for Printed Books and Bindings for the Pierpont Morgan Library, and Editor-in-Chief of Fordham University Press. R. 147–48.

These scholars testified uniformly that Sherlock Holmes and John H. Watson are complex fictional characters who were created not just in the early stories about them but throughout the entire Canon, with significant creative contributions to the characters coming in the Ten Stories. A. 27–28. The scholars quoted many of Mr. Klinger's own published comments about the Ten Stories' contribution to Holmes's character. A. 29–32.

The Ten Stories—which Mr. Klinger admits have copyright protection (R. 63)—develop and complete Holmes's character in the following ways:

• Holmes softens and grows more emotional, revealed in the copyrighted 1926 story "The Lion's Mane." A. 29.

• Copyrighted stories show that Holmes's and Watson's relationship has been changing over the years, developing in the Ten Stories into a truly close friendship. "The Three Garridebs" (1924) in great part creates this changing nature of Holmes's relationship with Watson. When the story's villain fires a gun at Holmes and Watson, wounding Watson, Holmes says:

> "You're not hurt, Watson? For God's sake, say you are not hurt!"
>
> It was worth a wound—it was worth many wounds—to know the depth of loyalty and love which lay behind that cold mask. The clear, hard eyes were dimmed for a moment, and the firm lips were shaking. For the one and only time I caught a glimpse of a great heart as well as a great brain. All my years of humble but single-minded service culminated in that moment of revelation.

A. 29. Their maturing relationship cannot be quantified in a precise way over time; it is a changing dimension of Holmes's character. Mr. Klinger himself admits in one of his books that this copyrighted scene shows that "Holmes's and Watson's relationship has grown from that of mere flat-mates in 1881 to the closest of friendships." A. 29.

• Holmes is given a knowledge of medicine that he uses for detection—previously unknown about him from public domain stories. A. 30.

• Holmes's character takes on a darker cast in the Ten Stories, even becoming less racially tolerant—which Mr. Klinger outside this lawsuit acknowledged is "an attitude markedly different from his evident racial tolerance on view in [an earlier public domain] story." A. 30.

• Holmes embraces modern technologies and uses them in his practice for the first time in copyrighted stories, revealing his attitude toward science and technology. In the copyrighted "Shoscombe Old Place" (1927), Holmes pioneers "the use of the microscope as an investigative tool," in Mr. Klinger's words, and in "The Lion's Mane" (1926), Holmes employs

photographic analysis for detection, which Mr. Klinger concedes was "not previously mentioned among the various techniques Holmes employs throughout the Canon." A. 30–31.

• Holmes changes from someone who cares little for dogs to someone with such great interest in them and their relationship to humans that, in the copyrighted "The Creeping Man" (1923), he intends to write a monograph on the subject. A. 30.

• The Ten Stories reveal that after Watson moved out of Baker Street, Holmes converted his practice into an "Agency" employing various informants and a "general utility man" named Mercer "who looks up routine business" for Holmes's Agency. A. 30.

• Holmes's famous retirement—from which we also learn of a gradual mellowing of his personality—is depicted only in the Ten Stories, in which we learn Holmes has given up London and his detective Agency and moved to the South Downs of Sussex where he keeps bees and writes about nature. A. 31.

These are broad strokes of Holmes's character development in the Ten Stories; far more expressive details could be identified by moving to greater levels of specificity. A. 31. Moreover, because the Ten Stories are set at various points earlier in Holmes's and Watson's lives and contribute to their character as younger men, it is impossible to maintain that Holmes

and Watson's characters are in the public domain up to a certain point in their fictional lives. A. 28.

Watson's character is also developed in the Ten Stories, which Mr. Klinger acknowledges apparently by mistake. His Complaint lists seven character traits of Dr. Watson allegedly limited to pre-1923 traits. But two of the seven traits are self-evidently from the Ten Stories. As recited in Mr. Klinger's Complaint, these are:

> • Second wife (*only mentioned in copyrighted stories* "The Illustrious Client" and "The Blanched Soldier")
>
> • Former athlete ("The Sussex Vampire")

R. 33 (emphasis added). Mr. Klinger's complaint admits that "The Sussex Vampire" is copyrighted. R. 34.

In addition, the Ten Stories reveal that Watson had a serious over-fondness for horse-racing, which he pays for with "half my wound pension." A. 32 (quoting "Shoscombe Old Place," 1927). This is the last Holmes story Sir Arthur wrote, but like other copyrighted stories, it is set earlier in Watson's life. *Id.*

Watson's second marriage made significant ripples in his and Holmes's character and relationship: as a result of the second marriage Watson moves out of Baker Street, which in turn alters his relationship with Holmes. A. 31. In a copyrighted 1926 story, Holmes calls Watson's remarriage and move "the only selfish action which I can recall in our

association. I was alone." A. 29. The move further required Holmes, instead of Watson, to narrate two cases, one before Holmes's retirement from active practice ("The Blanched Soldier," 1926), the other well into his retirement ("The Lion's Mane," 1926). A. 31. The implications of Watson's second marriage are even more far-reaching for his own character, leading some scholars to surmise that Watson married not merely twice but as many as five times. *Id*. The Ten Stories thus contribute to Watson's character and his relationship with Holmes during the middle of the men's careers.

Conan Doyle also presented affidavits from two literary experts:

- Larry Woiwode, bestselling author of sixteen books and approximately fifty short stories (many developing the same characters through multiple works) published in *The New Yorker*, *Esquire*, *The Atlantic Monthly*, *Harpers*, *The Paris Review*, and a variety of other publications; a Guggenheim and Lannan fellow and recipient of awards from the American Academy of Arts & Letters. R. 156.

- Valerie Sayers, Professor of English and chair of the English Department at the University of Notre Dame; oversees university courses on Sherlock Holmes; award-winning novelist and short story writer who has created the same character through multiple books; writer of over one hundred book reviews and essays in *The New York Times Book Review* and *The Washington Post*, among other publications. R. 179.

These experts testified that there are two kinds of literary characters: flat and round. Flat characters "are two-dimensional; without the depth and complexity of a living person; the opposite of a round character." A. 32; R. 158–59, 180. This distinction becomes critical when assessing characters who appear in a series of works. R. 159, 180. Flat characters in a series are fully created in the first story or episode, then go through different scenarios that bring about changes in dialogue and plot, but not character. R. 158, 181. Amos and Andy of the eponymous radio show are examples: flat characters who were fully created in their first radio play, with successive episodes that do not continue creating the characters. R. 158–59.

By contrast, round or complex characters in literary fiction continue to be created by their author through each story about them, frequently surprising or upsetting a reader's expectations. R. 180–81. The world's literature is full of examples of such characters created progressively through a series of stories: Sophocles' *Oedipus* trilogy, the Compson and Snopes characters in the novels of William Faulkner, the Adam Dalgleish novels of P.D. James, the Zuckerman novels of Philip Roth, John Cheever's Wapshot brothers, John Updike's Harry (Rabbit) Angstrom novels, and many more. R. 161, 183.

Sherlock Holmes is such a progressively-created round character, with all "the complex background and maturing emotions, thoughts, relationships and actions that characterize human development over time."

R. 180. The literary experts testified—and Mr. Klinger did not controvert—that a bright-line rule dictating that any series character was created in the first work should not be applied to every series in literature. *Id.* Such a rule is appropriate for flat or cartoon characters, but would do violence to much of our best literature, in which the original author continues to develop, mature, expand, and change the same complex character until it is completed. A. 33.

## SUMMARY OF ARGUMENT

The district court erred in ruling on the public domain status of a list of abstracted "story elements" which reduced Arthur Conan Doyle's richly expressed Holmes and Watson characters to bare ideas—while failing to consider the copyrights in those characters: "The Court, however, has already clarified that Klinger does not seek a judicial determination of the copyright status of the Sherlock Holmes character, however, and thus the Court does not address this issue." A. 21 n.8.

The district court further erred in ruling that Holmes and Watson were created only in the first story in the Canon, and the last 59 stories and novels of the Canon are derivative works of the first. This was error for three reasons: 1) the district court ignored disputed material facts about the dates and stories in which the Holmes and Watson characters were created; 2) the court erred in allowing the disintegration of Holmes and Watson as characters in violation of the copyright in each character, which the court

explicitly disregarded; and 3) the fully-realized Holmes and Watson characters are revealed only in the Ten Stories, and no workable standard exists to protect the Ten Stories' incremental character development apart from protecting the completed characters.

Mr. Klinger's argument that he will not use portions of the characters contributed in the Ten Stories ignores the nature of a character as a complex literary creation entitled to copyright protection. A complex character is less like a handful of pebbles placed on a table, from which one can add or subtract bits at will, as it is like a handful of pebbles thrown onto a pond. Each pebble may be a character trait, but it creates ripples that develop and that interact with other traits in inextricable patterns. Whether the pebbles are thrown into the pond all in one story or throughout a series of stories, the result is the same complex pattern constituting a character. Plaintiff can no more refrain from using the traits in the Ten Stories than he could unripple the pond.

For example, the growing closeness in Holmes and Watson's relationship is a contribution of the Ten Stories, by Mr. Klinger's own admission. A. 29–30. If in Mr. Klinger's proposed new book, one of the stories has the degree of closeness in Holmes and Watson's relationship at *s* on a scale of *a* to *z*, is that infringement? If another story in the book has the relationship at a more distant *j* on the scale, is that infringement? No taxonomy can be created to lay out all of Holmes's character traits on a

spectrum of development, with every point correlated to some story. Like a human, the way we know Holmes's character mellowed is from his actions, which reveal that he has been changing. Where and exactly when and how much he changed is, like human nature, somewhat mysterious. That is why characters are works of authorship separate from stories, as set forth below. By failing to address the copyrights in the Holmes and Watson characters as expressed in the Ten Stories, the district court improperly decided disputed facts and failed to apply the law.

Copyright law protects a complex series character as the single work of authorship it is, and should do so for a full copyright term running from the date the complex character was completed by its original author.

# ARGUMENT

## I

## STANDARD OF REVIEW

The Court reviews a grant of summary judgment de novo, construing all facts in the light most favorable to Conan Doyle as the non-moving party, and drawing all reasonable inferences in Conan Doyle's favor. *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 496 (7th Cir. 2011). Summary judgment may not be granted if material facts are disputed. *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1174 (7th Cir. 1986). This court reviews questions of subject matter jurisdiction de novo. *Village of DePue v. Exxon Mobile Corp.*, 537 F.3d 775, 782 (7th Cir. 2008).

## II

## DISTINCTLY DELINEATED CHARACTERS HAVE THEIR OWN COPYRIGHTS INDEPENDENT OF THE STORIES IN WHICH THEY APPEAR

Mr. Klinger's dispute with Conan Doyle is over his wish to use the characters Holmes and Watson without permission in his new book *In the Company of Sherlock Holmes*. Whether Mr. Klinger may do so requires consideration of copyright protection for those characters.

Sufficiently original literary characters have long been recognized as works of authorship entitled to copyright protection. *Gaiman v. McFarlane*, 360 F.3d 644, 660 (7th Cir. 2004) (holding comic book character distinct enough to have its own copyright because "age, obviously phony title ('Count'), what he knows and says, his name, and his faintly Mosaic facial features combine to create a distinctive character. No more is required for a character copyright."); *Nichols* v. *Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (Learned Hand, J.) (holding copyright protection is granted to a character if it is developed with enough specificity to constitute protectable expression).

Copyrightable characters are protected as works of authorship apart from the stories or novels in which they appear. *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003) (holding characters "receive protection apart from the copyrighted work"). *See also Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1266–67 (11th Cir. 2001) (Scarlet

O'Hara and Rhett Butler from *Gone with the Wind* protected by copyright); *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 632 (2d Cir. 1982) (Tarzan); *Walt Disney Prods. v. Air Pirates,* 581 F.2d 751, 755 (9th Cir. 1978) (Disney characters); *Salinger v. Colting*, 641 F. Supp. 2d 250, 254 (S.D.N.Y. 2009) (Holden Caulfield from *The Catcher in the Rye*), *vacated on other grounds*, 607 F.3d 68 (2d Cir. 2010).

Sherlock Holmes is among the most original and extensively delineated characters ever created. Courts and commentators have used him as an example of a highly delineated character obviously entitled to copyright protection. *Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.,* 900 F. Supp. 1287, 1296 (C.D. Cal. 1995) ("Like Rocky, Sherlock Holmes, Tarzan, and Superman, James Bond has certain character traits that have been developed over time through the sixteen films in which he appears."); *Azaria v. Bierko*, No. 2:12-CV-09732-GAF-RZ, slip op. at 7 (C.D. Cal. Feb. 21, 2014) (same). The author of *Goldstein on Copyright* begins his discussion of character copyrights with Holmes:

> Literary characters sometimes take on a life of their own apart from the story or novel in which they first appear. The many literary and dramatic sequels that have chronicled the exploits of private detectives and secret agents like Sherlock Holmes and James Bond only begin to suggest the substantial commercial value that can attach to literary characters.

Paul Goldstein, 1 *Goldstein on Copyright* § 2.7.2 (2014). Under this Court's test for character copyrightability, both Holmes and Watson are entitled to copyright protection independent of the works in which they appear. A. 27–28; *Gaiman*, 360 F.3d at 660 (holding original character delineation beyond that of stock character sufficient for copyright).

### A. Fictional Character Copyrights Have Strong Protection

Literary characters are not only protected by independent copyrights, but the more original a character, the stronger its copyright protection. *Metro-Goldwyn-Mayer*, 900 F. Supp. at 1303 (holding James Bond entitled to strong copyright protection because "careful visual delineation of a fictional character as developed over sixteen films and three decades, requires greater protection of the fictional works at issue than that accorded more factually-based or scientific works"). Originality is the "touchstone of copyright protection," both a constitutional as well as statutory requirement. *Feist Publ'ns Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 347 (1991). The more creative or original a work, the closer it is to "the core of intended copyright protection" and the more protection it is accorded. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994). Highly-developed literary characters should thus receive even stronger protection than flat characters, because there is more originality in a complex character than in a simple one. *See Stewart v. Abend*, 495 U.S. 207, 237–38 (1990) (holding works of fiction receive stronger protection than factual

works); *Metro-Goldwyn-Mayer, Inc.*, 900 F. Supp. at 1293–96 (holding character developed in many stories over thirty years entitled to stronger protection).

Sherlock Holmes and John Watson are highly original in both quality and quantity: they are entirely creative as opposed to factual, and there is a large quantity of creative detail in the two characters—their fictional lives span forty years, as created in sixty stories and novels. A. 27–28. Such complex fictional characters are at the core of what copyright was intended to protect and deserve the law's strongest protection. *Campbell*, 510 U.S. at 586; *Metro-Goldwyn-Mayer, Inc.*, 900 F. Supp. at 1293–96.

### B. Realistic Characters Are Often Created Over a Series of Stories

Characters cannot be registered in the Copyright Office to create a record of the date of their creation. But registration is an administrative matter only, with no effect on copyrightablility. 17 U.S.C. § 408(c)(1) (2006); William F. Patry, 2 *Patry on Copyright* § 3:164 (2014).

The question whether a copyrightable character was created in a series of stories—and which stories—is one of fact. 2 *Patry on Copyright* § 3:164 (noting that "particularly literary characters[ ] may take some time to develop, over multiple stories or films."). Courts have accordingly taught that the facts of character creation may include both creation by multiple authors or creation over multiple stories. In *Gaiman*, 360 F.3d at 650, 661, this Court found that a copyrightable comic-book character consisted of the

combination of one author's verbal description, name, and dialogue for the character, plus another author's drawing and coloring of the character.

Courts have also addressed characters created over multiple stories. In *Filmvideo Releasing Corp. v. Hastings*, 509 F. Supp. 60, 62 (S.D.N.Y.), *modified*, 668 F.2d 91 (2d Cir. 1981) the court found as a fact that the literary character Hopalong Cassidy was created over a series of novels and short stories published in 26 books between 1907 and 1935. The court found the character was "forged" in two books and "developed through the whole series." *Id.*, 509 F. Supp. at 65 (holding defendant had infringed literary character even if plot were not infringed). In *New Line Cinema Corp. v. Bertelsman Music Group*, 693 F. Supp. 1517, 1521 n.5 (S.D.N.Y. 1988) the court found plaintiff had copyright protection for the horror character Freddy Krueger as developed throughout a series of four motion pictures, and in *Anderson v. Stallone*, No. 87-0592 WDKGX, 1989 WL 206431 (C.D. Cal. 1989) the court addressed the fictional human character Rocky Balboa, finding that he was created over the course of three movies and "constituted expression protected by copyright independent from the story in which they are contained." *Id.* at * 6.[2]

[2] See also *Warner Bros., Inc. v. ABC, Inc.*, 720 F.2d 231, 235 (2d Cir. 1983) (holding that because plaintiff owned "the copyrights in various works embodying the character Superman," plaintiff "thereby acquired copyright protection for the character itself"); *Jim Henson Prods. Inc. v. John T. Brady & Assocs.*, 16 F. Supp. 2d 259, 262–63 (S.D.N.Y. 1997) (finding that the Muppets characters were created not merely as visual characters but also with consistent performances by the author's puppeteers five days a week over six years).

At least one court has addressed a realistic fictional character created over a great span of years and stories—and has done so in the situation where the creator no longer had copyrights in all of the stories creating that character. In *Metro-Goldwyn-Mayer, Inc.*, 900 F. Supp. at 1293–96, MGM sought an injunction against a Honda commercial using what MGM alleged was the thinly-disguised character James Bond. MGM asserted a copyright in the James Bond character as delineated in sixteen motion pictures over a span of thirty years—close to the forty-year period of Sherlock Holmes's creation. But MGM did not have copyrights in three stories developing the Bond character—the films *Casino Royale* and *Never Say Never Again*, and the television version of *Casino Royale.* Making an argument like Mr. Klinger's, the defendant used those facts to request summary judgment that MGM could not have copyright protection in the Bond character. The court rejected this argument and clarified that MGM was claiming a copyright in the character as developed in its sixteen films, and held "as a matter of law that Plaintiffs own the copyright to the James Bond character as expressed and delineated in their 16 films." *Id.* at 1303.

Mr. Klinger has argued that if, as Conan Doyle maintains, the Holmes and Watson characters were created in the whole Canon, then the characters were not sufficiently delineated to be copyrightable until completion of the Canon in 1927. R. 267. But that conclusion does not follow. Holmes and Watson were sufficiently delineated to be copyrightable in the

first work in the Canon, but that does not mean the characters were completed at that point. Both characters continued being developed by their original author in a continuous series until 1927. The *Filmvideo* court expressly recognized such a growing literary character. *Filmvideo*, 509 F. Supp. at 65 (finding character "developed through the whole series," and that defendant infringed the original author's "character development . . . in the overall series of Hopalong Cassidy Books."). In assessing the James Bond character, the *MGM* court did not hold that Bond was not copyrightable until sixteen films had been created. Surely he was a copyrightable character after the first. But the court acknowledged the reality that the character developed and grew over those sixteen films—and so must its copyright. There is no other way to read *Filmvideo* and *MGM* coherently, or the decisions addressing copyrights in the characters Rocky Balboa, Freddy Kreuger, and the Muppets. None of these courts looked for the bare minimum point at which the character became copyrightable; each of them held the copyright protects the fully-realized character as developed in the original author's series.

### C. The Factual Record on Creation Of the Holmes and Watson Characters

Conan Doyle presented extensive testimony to the district court demonstrating that the fictional characters of Holmes and Watson were continuously created through all sixty stories of the Canon, and cataloging

that development and completion in the copyrighted Ten Stories. A. 27–32; R. 139–96.

It is not surprising that an enormous amount of creative material goes into a complex character, since "[f]ully realized characters in literature are little different from fully defined personalities in daily life . . . ." 1 *Goldstein on Copyright*, at 2:92. Here, the chair of the English Department at the University of Notre Dame affirmed that "Sherlock Holmes has the complex background and maturing emotions, thoughts, relationships and actions that characterize human development over time." R. 180. As a character Holmes was continually being developed by his author in creative and sometimes surprising ways. *Id*. at 180–81.

Mr. Klinger, meanwhile, put forward a list of "Sherlock Holmes Story Elements" which consists of bare character traits reduced to the level of ideas: *e.g.*, "Bohemian nature," "Loner," "Smoking," and "Patriotic." A. 25–26. This is not the fully-realized, richly expressed character Arthur Conan Doyle created. By offering the list of bare ideas, Mr. Klinger so under-described the characters as to avoid copyright for them altogether, as Judge Hand famously explained in *Nichols*:

> If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of

> his mistress. These would be no more than Shakespeare's 'ideas' in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the Origin of Species. It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.

*Nichols*, 45 F.2d at 121. Although Mr. Klinger's list of story elements results in an indistinct character, that list is a misrepresentation of the true Sherlock Holmes created by its author. A. 27–32. It was error for the district court to grant summary judgment when the material facts of the makeup of Holmes's and Watson's characters were disputed. *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1173 (7th Cir. 1986) (holding fact issues precluded summary judgment). And the district court failed to apply the law to Mr. Klinger's request when it failed to address "the copyright status of the Sherlock Holmes character." A. 21 n.8.

In addition to cataloguing for the district court the development of Holmes's and Watson's characters in the Ten Stories, all of Conan Doyle's witnesses affirmed that Holmes's and Watson's characters are integral and unitary. A. 30, R. 136. As complex characters, their fully-realized development in the Ten Stories cannot be separated from the characters themselves. *Id.*

### D. The District Court Erred in its Assumption the Canon Consists of 59 Derivative Works All Recasting the First

The district court supported its decision with the legal and factual assumption that in a collection of short stories or novels developing the same character, each story after the first is a "derivative work." A. 39 ("the Court will assume . . . that the Ten Stories are derivative works of Sir Arthur Conan Doyle's first Sherlock Holmes story."). The court in effect decided Holmes and Watson as characters were created in the first story introducing them, and each successive novel or story about the character was derivative of the first, adding incremental expression in separable bits.

The theory has the attraction of being neat. But perhaps—like Procrustes' victims whose feet reached beyond his iron bed and were chopped off to fit—at the expense of the work of authorship itself. The district court in effect decided that the characters of Holmes and Watson fell into the public domain at the same time as the first story introducing them—even as the very same characters were still being created in later protected stories. Mr. Klinger argued this to the district court. R. 266–69.

This argument was rejected in *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 622 (2d Cir. 1982). Edgar Rice Burroughs created Tarzan over a series of novels beginning in 1912. Burroughs transferred all his rights to a company, ERB, Inc., and ERB in 1931 granted a license to MGM to use the character Tarzan in films. After passage of the 1976 Copyright

Act, Burroughs' children attempted to exercise their right to terminate Burroughs' assignment of all his rights to ERB—and to thereby stop MGM from producing another film based on its license to use the character. The children's notice of termination, however, listed thirty-five of Burroughs' works but omitted five of his Tarzan books. The court held that because ERB still had rights to five Tarzan novels, the character license to MGM was still valid. *Id.* at 622–23.

Then Burroughs' children made the argument Mr. Klinger makes here. Burroughs' children argued that the surviving interest in these five novels was irrelevant "because if Tarzan as a literary character is protectable by copyright, he was copyrightable only in his initial appearance, for only in that appearance was he original." *Id.* at 622. The children had properly revoked transfer of the first Tarzan novel. The court agreed that the children had properly revoked the transfer of the first Tarzan novel, but rejected the argument, holding that even where the copyright in the first novel introducing a character is terminated, MGM's right to use the five surviving novels gave it the right to use the character. *Id.* at 622–23.[3] The court did not divide the character into derivative

---

[3] Judge Newman dissented from this portion of the decision (though he concurred in the judgment), and would have followed the plaintiffs' argument that terminating the transfer of the first Tarzan novel terminated the grant of character rights. Judge Newman's view, in addition to not being the law, is factually distinguishable: in *Burroughs* there was "no dispute that the delineation [of the Tarzan character] was complete upon the 1912 appearance of the first Tarzan title *Tarzan of the Apes*." *Id.* at 631. The opposite is true here: Conan Doyle presented

fragments or hold that MGM only had the right to use incremental character developments in the five surviving stories.

In literary fiction the continuous development of a complex character over several novels or stories is not the creation of "so many 'derivative' or 'variant' versions of" the character—any more than several chapters of one novel create derivative versions of a protagonist, as the writer and professor Larry Woiwode testified. R. 158–59. The fact that Arthur Conan Doyle created Holmes and Watson throughout a series of stories—throwing a few pebbles into the pond in each story—is a distinction without a difference. The character Pierre in Tolstoy's *War and Peace* would be the same unitary complex character if Tolstoy had published *War and Peace* serially rather than in a single thousand-page book. Under the law of character copyrights, it is simply a fact issue to determine in what stories a particular character is created. *Metro-Goldwyn-Mayer, Inc.*, 900 F. Supp. at 1293–96 (holding character created in sixteen films over 30 years).

By refusing to address the fact issue of which stories create the character, the district court decision would simply dictate, for example, that in William Faulkner's series of Yoknapatawpha novels creating the Compson family characters, *Absolom, Absalom* is a derivative work of *The Sound and the Fury* because the same characters are present in each. Or that (if copyright protection applied) the last two plays in Sophocles'

---

substantial evidence that Sherlock Holmes's delineation was *not* complete in early stories.

Oedipus trilogy are derivative works of the first, *Oedipus Rex*. But in the creation of a complex character over a literary series, "the characters continue to develop—indeed, to surprise me—as they evolve in each new literary work," in the testimony of the writer and professor Valerie Sayers. R. 181–82. "A literary character formed by an author in a series of works is a single continuously-developing creation . . . ." R. 158. Such a character "is not divisible, though it has many dimensions—like any other person's character." R. 159.

Experts in both Sherlock Holmes and in literary series characters testified:

> The Holmes and Watson characters are each single works of authorship created throughout the Canon. Holmes's character was not complete with the first story, with 59 subsequent derivative variations as each successive story or novel was released. Holmes is a single individual who developed and changed in an organic way like a human person. Both his and Watson's arc as characters exist complete only in the entire Canon; no single published work or subset of the Canon can be considered derivative of any other subset.

A. 28.

1. No Court Has Ever Decided that in an Original Author's Own Series Creating a Complex Literary <u>Character, Works After the First Are Derivative Works</u>

The district court acknowledged that "[t]he Seventh Circuit has been silent on the issue of whether literary sequels or series constitute derivative works." A. 38. The Copyright Act defines "derivative work" as follows:

> A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

17 U.S.C. § 101 (2006). The line running through each example of a derivative work in the statute is that a derivative work is a recast, transformed, or adapted version of the original.

Accordingly this Court's derivative works cases apply the statute to works that recast, adapt, or transform an original. For example, this Court has held that a photograph of a copyrightable toy figure is a derivative work, *Schrock v. Learning Curve Int'l*, 586 F.3d 513, 519–20 (7th Cir. 2009); that a guitar in the shape of a copyrightable artistic symbol is a derivative work, *Pickett v. Prince*, 207 F.3d 402, 404–05 (7th Cir. 2000); and that porcelain dolls of Norman Rockwell illustration characters are derivative works, *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1193 (7th Cir. 1987).

Not only has this Court never held that in a short story collection or series of novels creating a complex literary character, all the stories or novels after the first are derivative works—but no court has so held. The district court relied on two cases and one commentator for its assumption to

the contrary. The first case, *Silverman v. CBS, Inc.*, 870 F.2d 40, 50–51 (2d Cir. 1989), addressed flat entertainment characters who were fully created in the first radio play about them, and the second, *Pannonia Farms, Inc. v. USA Cable*, No. 03-7841, 2004 WL 1276842 (S.D.N.Y. June 8, 2004), offered only a dictum on the subject. The commentator, *Nimmer on Copyright*, actually said only that sequels are "in a sense" derivative works,[4] and relied on an inapposite district court decision involving not a series but a single original work which was infringed 60 years later by a different writer making an unauthorized derivative work. That was a true derivative work, but the case nowhere suggests that an author's own original series creating one character involves derivative works. Accordingly, in evaluating literary series, this Court should look at the facts of where a character is created. Where a flat character is created in the first episode in a series and then re-used, subsequent works may well be derivative works. But where an author creates a single complex character throughout a series of works, the character is one original work of authorship. *See*, *e.g.*, *Filmvideo*, 509 F. Supp. at 65.

### 2. *Silverman* Was Correctly Decided for Flat Characters <u>But Should not Control Complex Literary Characters</u>

*Silverman* addressed the radio entertainment characters Amos and Andy. 870 F.2d at 42. Their original creators had given away their rights in

[4] Melville B. Nimmer and David Nimmer, 1 *Nimmer on Copyright*, § 2.12, at 2.178.31 (2013).

the early radio episodes and were suing for the right to use the characters again, which the court granted. *Id.* In that dynamic the decision parallels the Ninth Circuit's infamous[5] decision about Dashiell Hammett's character Sam Spade, *Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc.*, 216 F.2d 945 (9th Cir. 1954), in which the court found a way to allow Mr. Hammett to use his own character in a later work despite having assigned away his rights.

In *Silverman*, the original authors had given their rights to pre-1948 *Amos 'n' Andy* radio plays to CBS, and those radio plays were allowed to enter the public domain. 870 F.2d at 50–51. After 1948, CBS created several years' worth of copyrighted *Amos 'n' Andy* television shows. *Id.* at 42. The characters' original creators sought a declaration that the characters were in the public domain so that they could create a Broadway musical using their characters. *Id.* at 43.

The court held that the incremental additions to the characters in the television versions were protected even though the underlying written radio scripts were in the public domain. *Id.* at 50. In doing so, the court also held that the Amos and Andy characters revealed in those radio scripts went into the public domain along with the first scripts. *Id.* To do so, however, the court relied on Judge Newman's dissenting view in *Burroughs* that the

---

[5] Fifty years after the Sam Spade decision this Court stated, "That decision is wrong" and "The Ninth Circuit has killed the decision . . . ." *Gaiman*, 360 F.3d at 660.

Tarzan character was fully created in the first Tarzan novel. *Silverman* cited Judge Newman's opinion as a concurrence, although on that issue Newman dissented from the *Burroughs* majority. *Silverman*, 870 F.2d at 50.[6]

Even so, *Silverman's* holding is appropriate for Amos and Andy, who were flat characters fully created in the first episode about them. R. 158–59. A flat character is one "that is two-dimensional, without the depth and complexity of a living person; the opposite of a round character." *Id.* Flat characters do not continue to change in each new story; they merely find themselves in different scenarios bringing about changes in dialogue and plot, not character. *Id.*

In literary fiction, by contrast, characters continue to develop, frequently upsetting a reader's expectations. R. 180–81. Sherlock Holmes is such a character, having all of the complex background and maturing emotions, thoughts, relationships and actions that characterize human development over time. *Id.* One of the reasons for Holmes's unique appeal is precisely that Sir Arthur created surprising new facets of the Holmes character throughout the Canon. *Id.*

---

[6] A California district court has also picked up on Judge Newman's dissenting view in the context of termination of copyright grants. In *Siegel v. Warner Bros. Entm't Inc.*, 690 F. Supp. 2d 1048 (C.D. Cal. 2009) the issue was whether an incomplete termination notice was harmless error, not whether a character had fallen into the public domain. *Id.* at 1051–52, 1058–59, 1072–73.

To turn *Silverman* into a rule that any character in a series is completely created in the first work in that series—while it would accurately reflect the creation of flat characters in an entertainment series—would contradict reality for multi-dimensional and non-linear characters like Sherlock Holmes created continuously through many works. The *Silverman* rule misapplied to complex characters would result in their artificial dismemberment into derivative versions, and would take away their full term of copyright protection from the date of their completion as characters.[7] R. 163; R. 185.

Many of literature's most important characters were created over a series of works, from the characters of Sophocles, whose work mercifully would be unaffected, to those of Faulkner, Updike, Roth, P.D. James, and many others whose characters could be dismembered by the district court's decision. *Id.* While Sherlock Holmes will be one of the earlier complex literary series characters under the 1909 Copyright Act to enter the public domain, many more will follow. A rule that every character is created only in the first story about that character is simply untrue for many of these

[7] Although *Warner Bros. Entm't, Inc. v. X One X Prods.*, 644 F.3d 584 (8th Cir. 2011) followed *Silverman's* reasoning, its holding supports Conan Doyle. In *X One X*, film publicity posters, still photographs, and theater lobby cards for The Wizard of Oz and Gone with the Wind had entered the public domain, and a company began using the film characters on a variety of products. *Id.* at 590. The court held that the fact that still photographs showing characters from the movies were in the public domain did not inject the entirety of the film characters into the public domain, because these still images did not anticipate "the full range of distinctive speech, movement, demeanor, and other personality traits that combine to establish a copyrightable character." *Id.* at 598.

characters and would leave some of the core of copyright's subject matter—and our culture's greatest creations—with incomplete copyright protection.

### 3. *Pannonia Farms* Offered a Dictum Without Benefit Of Factual or Legal Development or the Proper Parties

The district court also relied on *Pannonia Farms, Inc.*, 2004 WL 1276842, an unreported district court decision purporting to apply *Silverman* to Arthur Conan Doyle's works. But Conan Doyle was not a party to that case; instead it was brought by a pretender to the Conan Doyle copyrights, an entity called Pannonia Farms, Inc., which filed suit against an alleged infringer. The holding in the case was that Pannonia Farms did not "own[ ] the copyrights, trademarks and related rights in the works of Sir Doyle." *Id.* at *6. But the court went further and stated in a dictum that *Silverman's* rule about the Amos and Andy characters would apply to Sherlock Holmes. *Id.* at *9.

The court did so without benefit of evidence on the creation of the character or briefing on the legal issues. Pannonia Farms, which owned no rights, told the court it was not claiming that the Holmes and Watson characters were protected by copyright. *Id.* at *9 n.19. The true owner of the rights, Conan Doyle, was not a party and had no opportunity to present the facts or law to the court. The court and parties even got the number of copyrighted Conan Doyle stories wrong, saying only nine are still copyrighted when in fact ten are, as Mr. Klinger concedes here. R. 82.

Courts to which the character copyright issue has been squarely presented have instead found that one copyrightable character may well be created throughout multiple stories. Cases cited above hold that Rocky Balboa, Hopalong Cassidy, the Muppets, Freddy Krueger, and Superman were all single characters created over multiple stories. *Stallone*, 1989 WL 206431 (Rocky created in three films); *Filmvideo*, 509 F. Supp. at 65 (Hopalong Cassidy "developed through the whole series" of 26 books); *Jim Henson Prods., Inc.*, 16 F. Supp. 2d at 262–63 (Muppets created over six years through performances five days a week); *New Line Cinema Corp.*, 693 F. Supp. at 1521 n.5 (Freddy Krueger created in four motion pictures); *Warner Bros.*, 720 F.2d at 235 (Superman developed in numerous works). The fact that characters have one copyright—not a multitude of derivative copyrights—confirms this analysis. No decision has suggested that a single character constitutes multiple works of authorship or has multiple copyrights.

#### 4. Professor Nimmer's View <u>Was Based on Faulty Reasoning</u>

Nimmer suggests that in a series about the same character, all stories after the first "are in a sense derivative works." *Nimmer*, § 2.12, at 2.178.31. But Nimmer's sole support for this theory is *Salinger v. Colting*, 641 F. Supp. 2d 250, 254 (S.D.N.Y. 2009), *vacated*, 607 F.3d 68 (2d Cir. 2010). The case did not address or consider a series of works by an original author. Salinger wrote only one book about his character Holden Caulfield.

An infringer pirated the character sixty years later in an unauthorized derivative work which he claimed was a fair use. The court appropriately called the infringement a derivative work, but the decision offers no support for the notion that an original author's own series creating one character is in any sense derivative.

But this faulty logic was the basis for Nimmer's suggested answer to the question presented in this case, which he acknowledged was "difficult":

> [M]ay the character depicted in all of the works be appropriated for use in a new story created by the copier? Assuming the character to be sufficiently developed as to be protectable, arguably such conduct would constitute an infringement of those works that remain in copyright. The better view, however, would appear to be that once a copyright in the first work that contained the character enters the public domain, then it is not copyright infringement for others to copy the character in works that are otherwise original with the copier, even though later works in the original series remain protected by copyright.

1 *Nimmer on Copyright*, § 2.12, at 2.178.30–31. Out of the four cases Nimmer cites to support his view, none is on point. One case addressed characters where the *entire* original series creating the characters had gone into the public domain. *Kurlan v. CBS, Inc.*, 256 P.2d 962, 968 (Cal. 1953) ("[A]ny property interest which [the original author] may have had in either the story or characters of 'My Sister Eileen' has been lost by publication."). The case thus cannot shed light on the question before this Court, where the Ten Stories are admittedly protected. In addition, the decision did not

involve federal copyright law, but rather a state intellectual property statute. *Id.* at 967.

The three remaining cases Nimmer cited to support his view are all cartoon cases involving classic flat characters created in their entirety in a single work. *Gantz v. Hercules Pub. Corp.*, 182 N.Y.S.2d 450, 453 (N.Y. Sup. Ct. 1959) (comic strip character Melvin the Monster; again the entire original series of works was in the public domain); *CBS, Inc. v. DeCosta*, 377 F.2d 315, 320 (1st Cir. 1967) (Plaintiff tried to create a character named "Paladin" out of himself, by wearing black suit, mustache, and using calling cards saying "Have Gun Will Travel"; court found no copyright protection in the persona); *Grant v. Kellogg Co.*, 58 F. Supp. 48, 52–53 (S.D.N.Y. 1944) (Snap, Crackle, and Pop, created on the back of a cereal box as mascots for Kellogg's Rice Krispies; again the figures' creator had transferred all his rights to Kellogg and had no remaining copyright interest at all, unlike Conan Doyle). None of these cases sheds any light on the continuing creation of a single character throughout a corpus, where a number of works creating the fully-developed character are still protected by copyright.

## III

## THE DISTRICT COURT'S DECISION OFFERS NO WORKABLE STANDARD FOR THIS OR FUTURE CASES

The district court criticized Conan Doyle's position for failing to provide a workable line for future cases, providing no case law to support its position, and running counter to prevailing case law. A. 15. The district

court did not mention *Metro-Goldwyn-Mayer, Inc.*, 900 F. Supp. 1287, *Anderson v. Stallone*, 1998 WL 206431, or even address whether the Holmes or Watson characters are protected by copyright, as set forth above.

Conan Doyle's position offers a workable precedent: on deciding that a character is sufficiently original, a court should determine in what stories a 1909-Act character was created, and protect that character for the statutory term running from publication of the work in which that character was completed by its original author.

Mr. Klinger's position, however, would call upon courts to make impossible distinctions. As described above, one of the contributions to Holmes's and Watson's characters in the Ten Stories is that their relationship changes and grows into close friendship. Like any good writer, however, Arthur Conan Doyle revealed this with action. In the copyrighted 1924 story "The Three Garridebs" Watson is wounded by a gunshot and Holmes's reaction indicates that things have been changing:

> "You're not hurt, Watson? For God's sake, say you are not hurt!"
>
> It was worth a wound—it was worth many wounds—to know the depth of loyalty and love which lay behind that cold mask. The clear, hard eyes were dimmed for a moment, and the firm lips were shaking. For the one and only time I caught a glimpse of a great heart as well as a great brain. All my years of humble but single-minded service culminated in that moment of revelation.

A. 29. Mr. Klinger himself has written (outside the context of this lawsuit) that it is this scene which shows "Holmes's and Watson's relationship has grown from that of mere flat-mates in 1881 to the closest of friendships." *Id.* The scene shows that Holmes has been changing under the surface for some time.

If in Mr. Klinger's proposed new book, one of the stories has the relationship between Holmes and Watson at *m* on a scale of *a* (representing Mr. Klinger's "flat-mates") to *z* (representing "the closest of friendships"), is that infringement? If another story in the book has the relationship at a more distant *k* on the scale—still a ways away from "flat-mates"—is that infringement? Any court asked to decide this might well feel it had been placed in a game of Blindman's Bluff.

Yet incremental character development in the Ten Stories must be protected, as even Mr. Klinger's position concedes. A. 15. In practice, however, his proposed rule cannot do so in any reliable way. That Mr. Klinger's proposed rule cannot be applied to a complex literary character reinforces the underlying reality: a complex character is one work, not a series of derivatives, and should be protected as one work from the date of its completion.

## IV

## WORKS AT THE CORE OF INTENDED COPYRIGHT PROTECTION SHOULD NOT RECEIVE DIMINISHED PROTECTION

The district court rightly noted that copyright is limited in time so that the public is not permanently deprived of the fruits of an author's labors. A. 15 (citing *Stewart*, 495 U.S. at, 228). For Conan Doyle, the last Sherlock Holmes story will enter the public domain on December 31, 2022. Less than nine years of protection remain. Moreover, Conan Doyle has always agreed that everything in the public domain stories of Arthur Conan Doyle is already free for anyone's use except the two works of authorship that begin in those stories and were completed in 1927: the Holmes and Watson characters.

The Supreme Court in *Stewart* noted that "although the dissemination of creative works is a goal of the Copyright Act, the Act creates a balance between the artist's right to control the work during the term of the copyright protection and the public's need for access to creative works." 495 U.S. at 228. The Court gave instruction on how to balance these competing policies:

> "While some limitations and conditions on copyright are essential in the public interest, they should not be so burdensome and strict as to deprive authors of their just reward . . . . [T]heir rights should be broad enough to give them a fair share of the revenue to be derived from the market for their works."

*Id.* at 229 (quoting Register of Copyrights, Copyright Law Revision, 87th Cong., 1st Sess., 6 (Comm. Print 1961)). Although the Court quoted this in the context of the operation of renewal rights under the 1909 Act, it is equally true of the balance in this case between the public domain and the limited-term protection of works at the core of intended copyright protection.

*Stewart* quoted *Harper & Row, Publishers, Inc v. Nation Enters.*, 471 U.S. 539, 563 (1985) in holding "[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Stewart*, 495 U.S. at 237. The public domain's call is adequately protected by the limited term of copyright protection granted by Congress—even if one disagrees with that term. *Eldred v. Ashcroft*, 537 U.S. 186 (2003). No policy should justify compromising or narrowing that term for fictional characters at the very core of copyright's intended protection. *Stewart*, 495 U.S. at 237–38.

# V

# THE DISTRICT COURT SHOULD HAVE DISMISSED THE CASE FOR LACK OF SUBJECT MATTER JURISDICTION

## A. The District Court Erred in Deciding an Actual Case or Controversy Existed at the Time Mr. Klinger Filed this Action

Article III of the Constitution requires that an "actual controversy must be extant at all stages of review, not merely at the time the complaint

is filed. *Alvarez v. Smith*, 558 U.S. 87, 92 (2009). The controversy must at all times remain "definite and concrete, touching the legal relations of parties having adverse legal interests." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, (2007). "[T]he party seeking relief must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 403 (S.D.N.Y. 2012) (internal quotation marks omitted). "Divorced from any concrete actual or threatened harm, the parties' abstract dispute about the law . . . falls outside the scope of the constitutional words Cases and Controversies." *Id.* at 404 (quoting *Alvarez*, 558 U.S. at 93 at 580) (internal quotation marks omitted).

The "mere fact that there is a dispute over some question . . . is not dispositive; if it were, the Declaratory Judgment Act could be invoked to answer any and every hypothetical question. Our constitutional system gives courts no such power." *U.S. Dept. of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.*, 475 B.R. 347, 359 (S.D.N.Y. 2012). The party seeking the declaratory judgment has "the burden of establishing the existence of an actual case or controversy." *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95 (1993).

It is clear from the Complaint that the controversy between Mr. Klinger and Conan Doyle relates to Mr. Klinger's desire to publish a new

book, *In the Company of Sherlock Holmes*, without a license.[8] Mr. Klinger relied on the following allegations to establish the required existence of an actual case or controversy:

> 29. On or about November 28, 2012, and prior to the signing of the publishing agreement for *In the Company of Sherlock Holmes*, Defendant's Agent contracted Pegasus and demanded that Plaintiffs and Pegasus enter into a licensing agreement with Defendants on the same terms as the previous agreement with Random House under the implied threat of an infringement action against Pegasus Books, King, Mr. Klinger and W.W. Norton if a license were not obtained from Defendant.
>
> 30. On or about November 28, 2012, Pegasus Books replied to Defendant's Agent by pointing out that *In the Company of Sherlock Holmes* would include only such characters and other story elements frrm the Canon that have already passed into the public domain and would not use any characters or other story elements that first appeared in one of the ten (10) stories that remain under copyright in the United States. Pegasus Books also explained that it could not afford the same licensing terms as those offered to Random House in connection with *A Study in Sherlock*.
>
> 31. On or about December 11, 2012, Defendant's Agent replied and invited "reasonable counter-proposals." However, despite the knowledge of Defendant and Defendant's Agent that the Sherlock Holmes Story Elements are now in the public domain, and without asserting that any characters or

[8] At the time Klinger filed his Complaint, Conan Doyle had been alerted that *In the Company of Sherlock Holmes* would infringe its rights when one of the authors invited to contribute to it, Michael Dirda, informed Conan Doyle that he intended to use Conan Doyle's fictional character Langdale Pike. A. 35. This character originated in the copyrighted 1926 story "The Three Gables." *Id.* In addition, Conan Doyle was aware that Klinger had used story elements from the Ten Stories in at least four of the sixteen stories in *A Study in Sherlock*, for which Random House procured a license from Conan Doyle. A. 34. Conan Doyle's actions were all taken based upon its concern that *In the Company of Sherlock Holmes* would infringe its copyrights.

> other story elements that remain under copyright would be used, Defendant's Agent threatened to wrongfully interfere with the publication of *In the Company of Sherlock Holmes*, which was then identified by the working title *Study in Sherlock II*, as follows: "If you proceed instead to bring out *Study in Sherlock II* unlicensed, do not expect to see it offered for sale by Amazon, Barnes & Noble, and similar retailers. We work with those companys routinely to weed out unlicensed uses of Sherlock Holmes from their offerings, and will not hesitate to do so with your book as well.
>
> 32. On or about December 11, 2012, Pegasus Books informed Defendant's Agent that "[w]e are advised that no license is necessary for the book we are preparing for publication, and we will not be responding to any further communications on this matter." No further communications have been exchanged between Defendant on one side, and Mr. Klinger, King or Pegasus, on the other side, through the date of filing of this Complaint.
>
> 33. As a result of the demands and threats of Defendant and Defendant's Agent as alleged above, Plaintiff has a reasonable apprehension that Defendant will file suit against him, his co-editor, and their licensees in the United States if *In the Company of Sherlock Holmes* is published.
>
> 34. Pegasus Books, as a direct and proximate result of the threats and demands of Defendant, has declined to enter into the publishing agreement for publication of *In the Company of Sherlock Holmes* so long as the threat of a copyright infringement action by Defendant is present and has expressed its willingness to do so only if Plaintiff is successful in adjudicating the public domain status of the Sherlock Holmes Story Elements.

R. 23–25. The case or controversy alleged is clearly over whether Mr. Klinger's publication of *In the Company of Sherlock* Holmes will infringe Conan Doyle's copyrights. Mr. Klinger's recent Motion for Expedited Briefing and Consideration emphasizes this point. In that Motion, Mr.

Klinger argues that Conan Doyle's "appeal of the district court's judgment creates lingering doubt as to whether publication could expose those involved to liability for copyright infringement." (*See* Appellee's Mot. for Expedited Briefing & Consideration, Doc. 6, filed Feb. 25, 2014, at 4.) Unfortunately, the district court did not exercise jurisdiction to resolve this dispute.

Rather than request a declaration on the infringement dispute or provide his new book and Conan Doyle's works to the district court to resolve that dispute, Mr. Klinger requested a declaration that certain "Sherlock Holmes Story Elements" are in the public domain. R. 18. Such a request is exactly the kind of academic, hypothetical dispute that is not a constitutionally justiciable case or controversy.

Crucial to resolving the actual case or controversy between the parties are decisions regarding (1) whether Mr. Klinger uses the Holmes and Watson characters in *In the Company of Sherlock Holmes*, and (2) if so, whether he has used them in a way that would not infringe Conan Doyle's copyrights. But Mr. Klinger does not request that the district court resolve whether his use of those characters avoids infringement. Rather, the district court stated: "The Court . . . has already clarified that Klinger does not seek a judicial determination of the copyright status of the Sherlock Holmes character, however, and thus the Court does not address this issue." A. 21, n.8 (internal citation omitted). Absent a decision on this issue, however, the

infringement suit or injury Mr. Klinger apprehends and sought to avoid through declaratory relief is not addressed or resolved. *See Velvet Underground*, 890 F. Supp. 2d at 403.

The relief Mr. Klinger requested and the decision the district court made ignore that the actual case and controversy between Conan Doyle and Mr. Klinger is whether the characters Holmes and Watson have copyright protection, and if so, whether the way in which they are used in *In the Company of Sherlock Holmes* violates those copyrights. This is the case or controversy that establishes the district court's subject matter jurisdiction. Rather than exercise jurisdiction to decide that case and controversy, the district court issued an improper advisory opinion without considering the copyrighted works or the alleged infringing book, based only on a list of abstract elements that left out the property at issue: the characters Holmes and Watson.

### B. The District Court Should Have Declined Jurisdiction for Prudential Reasons

Even if the case or controversy requirement were met, the Declaratory Judgment Act "has long been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *MedImmune, Inc.*, 549 U.S. at 136. Accordingly, a court may refuse to grant declaratory relief for prudential reasons. *Alcan Aluminum Ltd. v. Dep't of Revenue of Oregon*, 724 F.2d 1294, 1298 (7th Cir.

1984). "Declaratory judgment should not be granted to try particular issues without settling the entire controversy . . . ." *Sears, Roebuck & Co. v. American Mut. Liab. Ins. Co.*, 372 F.2d 435, 438 (7th Cir. 1967). In this case, the district court abused its discretion by exercising its jurisdiction without settling the entire case or controversy between Conan Doyle and Mr. Klinger. The question whether Mr. Klinger's book infringes will still need to be decided after this action is concluded.

Notwithstanding Mr. Klinger's belief otherwise, the district court's declaratory judgment did not "enable Klinger to move forward with the publication of his collection without reservation or hesitation that the Estate may seek to enforce a copyright interest." Appellee's Mot. for Expedited Briefing and Consideration at 6. To the contrary, Mr. Klinger did not seek and the district court did not determine the copyright status of the Holmes and Watson characters or whether *In the Company of Sherlock Holmes* infringes Conan Doyle's copyrights. Without the benefit of reviewing the concrete use of the protected work at issue, the district court issued an advisory opinion about the hypothetical use of certain story elements and left for another day the decision about whether Mr. Klinger's use of the Holmes and Watson characters infringes Conan Doyle's copyrights. Having done so, the district court abused its discretion by exercising jurisdiction over one particular issue without settling the entire case or controversy between Conan Doyle and Mr. Klinger.

## CONCLUSION

For all the foregoing reasons, Appellant Conan Doyle respectfully requests reversal of that part of the district court's decision granting partial summary judgment in favor of Mr. Klinger.

Respectfully submitted,

SUTIN THAYER & BROWNE
A Professional Corporation

By *<u>/s/ Benjamin Allison</u>*
Benjamin Allison (*pro hac vice*)

P. O. Box 2187
Santa Fe, New Mexico 87504-2187
(505) 988-5521 / (505) 982-5297 fax

William F. Zieske (#6244180)
ZIESKE LAW / FINE ARTS LEGAL
123 S. Eastwood Drive #222
Woodstock, Illinois 60098
(312) 252-9599 / (312) 278-0955 fax

*Counsel for Appellant*
*Conan Doyle Estate Ltd.*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing Brief of Defendant-Appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,208 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Version 2007 in 12 point Century Schoolbook font.


SUTIN THAYER & BROWNE
A Professional Corporation

By */s/ Benjamin Allison*
Benjamin Allison (*pro hac vice*)

P. O. Box 2187
Santa Fe, New Mexico 87504-2187
(505) 988-5521 / (505) 982-5297 fax

William F. Zieske (#6244180)
ZIESKE LAW / FINE ARTS LEGAL
123 S. Eastwood Drive #222
Woodstock, Illinois 60098
(312) 252-9599 / (312) 278-0955 fax

*Counsel for Appellant*
*Conan Doyle Estate Ltd.*

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by Circuit Rule 30(a) and (b) are included in the Appendix.


SUTIN THAYER & BROWNE
A Professional Corporation

By */s/ Benjamin Allison*
Benjamin Allison (*pro hac vice*)

P. O. Box 2187
Santa Fe, New Mexico 87504-2187
(505) 988-5521 / (505) 982-5297 fax

William F. Zieske (#6244180)
ZIESKE LAW / FINE ARTS LEGAL
123 S. Eastwood Drive #222
Woodstock, Illinois 60098
(312) 252-9599 / (312) 278-0955 fax

*Counsel for Appellant*
*Conan Doyle Estate Ltd.*

# CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2014, the Brief of Defendant-Appellant was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

The following participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system:

Scott M. Gilbert
John A. Leja
POLSINELLI PC
Suite 4200
161 N. Clark Street
Chicago, IL 60601-0000

SUTIN THAYER & BROWNE
A Professional Corporation

By*/s/ Benjamin Allison*
Benjamin Allison (*pro hac vice*)

P. O. Box 2187
Santa Fe, New Mexico 87504-2187
(505) 988-5521 / (505) 982-5297 fax

William F. Zieske (#6244180)
ZIESKE LAW / FINE ARTS LEGAL
123 S. Eastwood Drive #222
Woodstock, Illinois 60098
(312) 252-9599 / (312) 278-0955 fax

*Counsel for Appellant*
*Conan Doyle Estate Ltd.*

# APPENDIX

TABLE OF CONTENTS

PAGE

District Court's Order entered
Entered December 23, 2013 .......... A-1

District Court's Memorandum Opinion and Order
Entered December 23, 2013 .......... A-2

Judgment in a Civil Case
Entered December 23, 2013 .......... A-24

Exhibit A to Complaint for Declaratory Judgment
Entered July 29, 2013 .......... A-25

Defendant's Rule 56.1(b)(3) Response to Plaintiff's
Statement of Material Facts and Statement of
Additional Material Facts, (Pages 9–17)
Entered September 10, 2013 .......... A-27

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Leslie S. Klinger, Plaintiff | ) | Case No: 13 C 1226 |
| v. | ) | Judge: Ruben Castillo |
| Conan Doyle Estate, Ltd., Defendant | ) | |

**<u>ORDER</u>**

Enter Memorandum Opinion and Order. Plaintiff's motion for summary judgment is granted in part and denied in part. Declaratory judgment is entered in favor of the plaintiff and against the defendant only to the extent stated in the Court's opinion.

Date: 12/23/13 /s/ Chief Judge Ruben Castillo

U.S. DISTRICT COURT
CLERK
2013 DEC 23 PM 2:26

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LESLIE S. KLINGER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 13 C 1226** |
| **v.** | ) | |
| | ) | **Chief Judge Rubén Castillo** |
| **CONAN DOYLE ESTATE, LTD.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Leslie S. Klinger ("Klinger") brings this copyright action against Defendant Conan Doyle Estate, Ltd. ("Conan Doyle"), seeking a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. Specifically, Klinger seeks a declaration that various characters, character traits and other story elements from Sir Arthur Conan Doyle's Sherlock Holmes stories are free for the public to copy without infringing Conan Doyle's rights under the Copyright Act, 17 U.S.C. § 101 *et seq*. Presently before the Court is Klinger's motion for summary judgment. For the reasons set forth below, the Court grant's Klinger's motion in part and denies it in part.

## RELEVANT FACTS[1]

Sir Arthur Conan Doyle authored four novels and fifty-six short stories (collectively, "the Canon") featuring the fictional characters of detective Sherlock Holmes and his friend and colleague Dr. John H. Watson. (Conan Doyle's Rule 56.1 Resp. ¶¶ 1, 8.) Sir Arthur Conan

[1] The Court takes the undisputed facts from the parties' Local Rule 56.1 statements of material facts. (R. 13, Klinger's Local Rule 56.1 Statement of Material Facts ("Klinger's Facts"); R. 27, Conan Doyle's Local Rule 56.1 Response to Klinger's Facts ("Conan Doyle's Rule 56.1 Resp."); Conan Doyle's Statement of Additional Facts ("Conan Doyle's Facts"); and R. 29, Klinger's Response to Conan Doyle's Facts ("Klinger's Rule 56.1 Resp.").)

Doyle first introduced these characters in "A Study in Scarlet," which was first published in *Beeton's Christmas Annual* in 1887 and first released in the United States in 1890. (Conan Doyle's Rule 56.1 Resp. ¶ 8.) The four novels and forty-six of the fifty-six short stories were first published in the United States on various dates prior to January 1, 1923.[2] (Conan Doyle's Rule 56.1 Resp. ¶ 11.) The ten short stories remaining under copyright protection (the "Ten Stories") are set forth in Exhibit B to the complaint. (R. 1-2, Ex. B, Ten Stories.)

Conan Doyle is a company owned by members of Sir Arthur Conan Doyle's family. (Klinger's Rule 56.1 Resp. ¶ 1.) Conan Doyle licenses its intellectual property, including copyrights, in the works of Sir Arthur Conan Doyle to third parties through its exclusive authorized licensing agents in the United States. (Conan Doyle's Rule 56.1 Resp. ¶ 5.) Klinger is the author and editor of twenty-seven books and dozens of articles in the mystery and thriller literature genre, including two dozen books and numerous articles on Sherlock Holmes and the Canon. (Conan Doyle's Rule 56.1 Resp. ¶ 1.)

## I. *A Study in Sherlock*

Klinger is the co-editor, along with Laurie R. King, of *A Study in Sherlock*, an anthology of new and original short stories by contemporary authors. (Conan Doyle's Rule 56.1 Resp. ¶ 2.) The stories in *A Study in Sherlock* were inspired by the Canon and feature various characters and story elements from the Canon. (Conan Doyle's Rule 56.1 Resp. ¶ 2.) Klinger and King entered into a contract with Random House to publish the anthology. (Conan Doyle's Rule 56.1 Resp. ¶

[2] Both parties agree that the works in the Canon published prior to 1923 are in the public domain. (Conan Doyle's Rule 56.1 Resp. ¶ 13.) *See* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 9.11[B][1] ("[W]orks first published through the end of 1922 remain unprotected today."); *see also Societe Civile Succession Guino v. Renoir*, 549 F.3d 1182, 1189 (9th Cir. 2008) ("[T]he U.S. copyright in any work published or copyrighted prior to January 1, 1923, has expired by operation of law, and the work has permanently fallen into the public domain in the United States.") (internal citations omitted).

2.) Before Random House published *A Study in Sherlock*, Conan Doyle intervened to assert its exclusive copyright over the use of the characters Sherlock Holmes and Dr. Watson. (Conan Doyle's Rule 56.1 Resp. ¶ 21.) Conan Doyle informed Random House that it must enter into a licensing agreement with it in order to publish the anthology. (*Id.*) Although Klinger and King believed that the law did not require them to obtain a license, Random House disagreed and entered into a licensing agreement with Conan Doyle. (*Id.*)

## II. *In the Company of Sherlock Holmes*

Klinger and King are also the co-editors of a sequel to *A Study in Sherlock*, currently titled *In the Company of Sherlock Holmes*, which is another collection of new and original short stories featuring various characters and story elements from the Canon. (Conan Doyle's Rule 56.1 Resp. ¶ 3.) Klinger and King are currently preparing *In the Company of Sherlock Holmes* for publication by Pegasus Books and distribution by W.W. Norton & Company. (*Id.*) At Klinger's insistence, literary critic and historian Michael Dirda, a contributing author to the new anthology, informed Conan Doyle of his intention to use Sir Arthur Conan Doyle's fictional character Langdale Pike in his new story. (Klinger's Rule 56.1 Resp. ¶ 12; R. 29-1, Klinger's Suppl. Decl. ¶ 9.) The character originated in the short story "The Three Gables," published in the 1926 *Case-Book*, which is currently under copyright protection. (*Id.*)

An agent acting on behalf of Conan Doyle contacted Pegasus Books and insisted that the publisher obtain a license from Conan Doyle in order to publish *In the Company of Sherlock Holmes*. (Klinger's Facts ¶ 21 (citing R. 13-4, Klinger's Decl. ¶ 3).) Conan Doyle further informed Pegasus Books that it works with retailers such as Amazon and Barnes & Noble to weed out unlicensed uses of Sherlock Holmes and "[would] not hesitate to do so with your book as well." (Klinger's Facts ¶ 21 (citing R. 1, Compl. ¶ 31).) Out of fear of litigation, Pegasus

Books refused to finalize its contract with Klinger and King to publish *In the Company of Sherlock Holmes*. (R. 29-1, Ex. A, Hancock E-mail.) Klinger believes that a license is unnecessary to use the Sherlock Holmes Story Elements in the new anthology, (Klinger's Facts ¶ 21 (citing R. 1, Compl. ¶ 30)), whereas Conan Doyle asserts that using the characters of Sherlock Holmes and Dr. Watson in the anthology requires a license, (Conan Doyle's Rule 56.1 Resp. ¶ 21). In order to proceed with the publication of *In the Company of Sherlock Holmes*, Klinger seeks to have this Court determine the copyright status of a list of specific characters, character traits, dialogue, settings, artifacts, and other story elements in the Canon (the "Sherlock Holmes Story Elements") (R. 1-1, Ex. A, Sherlock Holmes Story Elements). (Klinger's Facts ¶ 21 (citing R. 1, Compl. ¶ 34).)

## PROCEDURAL HISTORY

Klinger initiated this action on February 14, 2013. (R. 1, Compl.) In Count I, the sole count of the complaint, Klinger seeks a declaratory judgment establishing that the public is entitled to copy the expression embodied in the Ten Stories set forth in Exhibit B, (R. 1-2, Ex. B, Ten Stories), and as to the Sherlock Holmes Story Elements set forth in Exhibit A, (R. 1-1, Ex. A, Sherlock Holmes Story Elements). On June 25, 2013, the Court entered a default against Conan Doyle for failure to timely appear, answer, or otherwise plead to the complaint.[3] (R. 10, Min. Entry.) The Court permitted Klinger to proceed with filing either a motion for summary judgment or a motion for default judgment. (*Id.*) On July 29, 2013, Klinger filed a motion for

[3] Upon entry of default, the Court takes all well-pleaded allegations in Klinger's complaint as true. *Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983). The entry of a default order does not, however, preclude a party from challenging the sufficiency of the complaint. *Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994) (internal citations omitted). *See* 10A Charles Alan Wright et al., Federal Practice and Procedure § 2688 (3d ed. 1998) ("Even after the default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.")

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (R. 11, Klinger's Mot. Summ. J.) This fully briefed motion is presently before the Court.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court does not evaluate the weight of the evidence, judge the credibility of the witnesses, or determine the ultimate truth of the matter; instead, the Court's role is simply to ascertain whether there exists a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "A disputed fact is 'material' if it might affect the outcome of the suit under governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009) (citing *id.* at 248). In determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in his favor. *Anderson*, 477 U.S. at 255; *see Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) ("Even on summary judgment, district courts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record.")

The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). The moving party "can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party has met this burden, the non-moving party must "set forth specific facts showing that there is a

genuine issue for trial." *Celotex*, 477 U.S. at 322 n.3 (quoting Fed. R. Civ. P. 56(e) (1987)). The non-moving party may not rely on "mere conclusions and allegations" to create a genuine issue of material fact. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 247-48). In order to defeat a motion for summary judgment, the non-moving party "must make a showing sufficient to establish any essential element of her cause of action for which she will bear the burden of persuasion at trial." *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). The Court's inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

\ On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements of material facts. *See Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) (referring to Local Rules 12(M) and (N), which were replaced by Local Rule 56). To adequately dispute a statement of fact, the opposing party must cite specific support in the record; an unsubstantiated denial or a denial that is mere argument or conjecture is not sufficient to create a genuinely disputed issue of material fact. *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008).

## ANALYSIS

### I. Availability of Declaratory Judgment

As a preliminary matter, the Court addresses a threshold issue regarding Klinger's request for declaratory relief. The Declaratory Judgment Act (the "DJA") authorizes a federal court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other

legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). The DJA does not confer subject matter jurisdiction, and therefore the Court must "possess an independent basis for jurisdiction." *GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 619 (7th Cir. 1995) (citing *Skelly Oil Co. v. Phillips Petroletum* Co., 339 U.S. 667, 671 (1950)). Here, Klinger invokes federal question jurisdiction, 28 U.S.C. § 1331, pursuant to the Copyright Act, 17 U.S.C. § 101 *et seq*, as well as a jurisdiction-enabling statute relating to copyrights, 28 U.S.C. 1338(a). (R.1, Compl. ¶ 6.) The Court is thus satisfied that it possesses an independent basis for jurisdiction over the case.

The DJA's "actual controversy" requirement is equivalent to Article III's case-or-controversy requirement. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Conan Doyle contends that no "actual controversy" exists because Klinger faced no reasonable apprehension of litigation. (R. 28, Conan Doyle's Mem. at 14.) Klinger argues that the threat of litigation is not necessary to establishing an actual controversy, or in the alternative, that Conan Doyle's threat to police online retailers pursuant to the Digital Millennium Copyright Act ("DMCA") constitutes a threat sufficient to create an actual controversy within the meaning of the DJA. (R. 30, Klinger's Reply at 12.)

In *MedImmune, Inc. v. Genentech, Inc.*, the Supreme Court reiterated that the case or controversy requirement of Article III can be satisfied without a threat of litigation. 549 U.S. at 132-33. The Court explained that whether an actual controversy exists depends on "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 127 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). The Court stated that in choosing between abandoning his rights or risking

prosecution, a potential infringer faces "a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Id.* at 129 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967)). Dispelling the "reasonable apprehension of litigation" test Conan Doyle relies on here, the Court cited cases in which declaratory judgment jurisdiction was proper despite there being no indication of litigation. *Id.* at 132 n.11 (citing *Md. Cas. Co.*, 312 U.S. at 273, and *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239 (1937)). "Indeed, post-*MedImmune*, it is clear that a declaratory judgment plaintiff does not need to establish a reasonable apprehension of a lawsuit in order to establish that there is an actual controversy between the parties." *Geisha, LLC v. Tuccillo*, 525 F. Supp. 2d 1002, 1012 (N.D. Ill. 2007) (quoting *Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*, 497 F.3d 1271, 1283-84 (Fed. Cir. 2007)) (internal quotation marks omitted).

Recognizing that the DJA confers on federal courts "unique and substantial discretion in deciding whether to declare the rights of litigants," *MedImmune*, 549 U.S. at 136 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)), the Court follows *MedImmune*'s guidance in determining whether exercising federal jurisdiction is proper in this case. First, a substantial controversy exists between Klinger and Conan Doyle pertaining to Klinger's legal rights to create new derivative works based on the Sherlock Holmes Story Elements. Next, the parties have clear, adverse legal interests as Klinger seeks to use the Sherlock Holmes Story Elements, and Conan Doyle seeks to exert its exclusive copyright over the Elements. Determining the copyright status of the Sherlock Holmes Story Elements is a real and immediate concern to Klinger, as his ability to publish *In the Company of Sherlock Holmes* with Pegasus Books hinges on the issuance of this declaratory judgment. (Klinger's Facts ¶ 21.) Klinger is constrained from engaging in "extra-judicial conduct (that the law does not aim to discourage) so long as its . . .

rights are unclear." *Hyatt Int'l. Corp. v. Coco*, 302 F.3d 707, 712 (7th Cir. 2002); *see also Sears, Roebuck & Co. v. Am. Mut. Liab. Ins. Co.*, 372 F.2d 435, 438 (7th Cir. 1967) ("the purpose of the Act [is] to afford relief from uncertainty and insecurity with respect to legal relations"). Accordingly, the Court is satisfied that this case presents an actual case or controversy as required by the DJA.

Conan Doyle argues that even if an "actual controversy" exists, the Court should decline to exercise jurisdiction over the case for prudential reasons. (R. 28, Conan Doyle's Reply at 14-15.) Specifically, it argues that this case is actually about whether Klinger's new anthology infringes upon Conan Doyle's copyright. (*Id.* at 15.) Therefore, it contends that because Klinger did not offer *In the Company of Sherlock Holmes* to the Court to determine if it infringes upon Conan Doyle's copyright, the Court cannot resolve the entire conflict in this action. (*Id.*) Klinger counters that he is asking the Court to clarify the copyright status of the Sherlock Holmes Story Elements so that he, along with the public, may use the Elements without being subject to Conan Doyle's licensing demands. (R. 30, Klinger's Reply at 14.)

Conan Doyle is correct that a "[d]eclaratory judgment should not be granted to try particular issues without settling the entire controversy." *Sears, Roebuck & Co.*, 372 F.2d at 438. Klinger has clarified that he seeks a determination only as to the copyright status of the Sherlock Holmes Story Elements, not *In the Company of Sherlock Holmes*. (R. 1, Compl. at 16; R. 14, Klinger's Mem. at 4.) Klinger alleges that *In the Company of Sherlock Holmes* only employs the Sherlock Holmes Story Elements and does not utilize other story elements from the Ten Stories. (R. 1, Compl. ¶¶ 25, 30.) In fact, Klinger states that he instructed Dirda to seek a license from Conan Doyle for the use of any character or story elements that are still under copyright protection. (R. 29-1, Klinger's Suppl. Decl. ¶ 9.) Therefore, once the Court clarifies

the copyright status of the Sherlock Holmes Story Elements, the outcome of this action should prevent any future litigation between Klinger and Conan Doyle as to the Sherlock Holmes Story Elements. *See Sears, Roebuck & Co.*, 372 F.2d at 438 ("The standards generally to be applied in exercising discretion to hear a declaratory judgment action are whether a declaratory judgment will settle the particular controversy and clarify the legal relations in issue.") Consequently, the Court will exercise its jurisdiction over the case.

## II. Pre-1923 Sherlock Holmes Story Elements[4]

Klinger seeks a judicial determination that the Sherlock Holmes Story Elements are free for public use because the stories in which the elements were first introduced have entered the public domain. (R. 14, Klinger's Mem. at 4.) Conan Doyle, on the other hand, argues that because Sherlock Holmes and Dr. Watson were continually developed throughout the entire Canon, the copyright protecting the Ten Stories should extend to the Sherlock Holmes and Dr. Watson characters and the story elements pertaining to those characters. (R. 28, Conan Doyle's Mem. at 6.) The Court must first determine which elements were first introduced in public domain stories ("Pre-1923 Story Elements") and which were introduced in the copyrighted Ten

---

[4] In his complaint, Klinger alleges that the Ten Stories listed in Exhibit B and the Sherlock Holmes Story Elements contained in Exhibit A are in the public domain and thus available for public use. (R. 1, Compl. ¶ 40.) Klinger fails, however, to offer any argument regarding the copyright status of the Ten Stories in his motion for summary judgment or subsequent pleadings. The Ten Stories are plainly still subject to copyright protection, a fact that Klinger acknowledges in Exhibit B, where he states that the Ten Stories "have not yet entered the public domain in the United States of America." (R. 1-2, Ex. B, Ten Stories.) Klinger has thus abandoned the argument that the Ten Stories are in the public domain. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (deeming the plaintiff's negligence claim abandoned because he failed to delineate it in his brief in opposition to summary judgment); *Oak Brook Hotel Co. v. Teachers Ins. & Annuity Ass'n of Am.*, 846 F. Supp. 634, 641 (N.D. Ill. 1994) (finding the plaintiff's failure to defend a particular claim in response to the defendant's motion for summary judgment constituted abandonment of the claim). Accordingly, the Court will only address the copyright status of the Sherlock Holmes Story Elements. (R. 1-1, Ex. A, Sherlock Holmes Story Elements.)

Stories ("Post-1923 Story Elements"). Klinger and the public may use the Pre-1923 Story Elements without seeking a license. *See Silverman v. CBS, Inc.*, 870 F.2d 40, 50 (2d Cir. 1989) (holding that where some radio scripts from a radio show had entered the public domain and others were protected by copyright, plaintiff was entitled to use the public domain material without a license). The Court subsequently must examine the Post-1923 Story Elements to determine if they constitute "increments of expression," and are thereby protected from unauthorized use by the Conan Doyle's copyright in the Ten Stories, or if they belong to the class of story elements, such as events, plots and ideas, which are not copyrightable. *See id.* (holding that the copyrighted radio scripts only protected the "increments of expression" beyond what was contained in the public domain radio scripts).

Klinger first argues that the Sherlock Holmes Story Elements originated in works that have entered the public domain, and are thus free to any member of the public to use. (R. 14, Klinger's Mem. at 6.) Conan Doyle does not dispute that the works that comprise the Canon, with the exception of the Ten Stories, are in the public domain. (R. 28, Conan Doyle's Mem. at 1.) Further, it does not directly discuss the copyright status of the Pre-1923 Story Elements. Instead, Conan Doyle proffers a novel legal argument that the characters of Sherlock Holmes and Dr. Watson continued to be developed throughout the copyrighted Ten Stories and therefore remain under copyright protection until the final copyrighted story enters the public domain in 2022.[5] (*Id.* at 3-8.) Conan Doyle argues that because the Sherlock Holmes Story Elements

[5] It appears that Conan Doyle believes the copyrights of the Ten Stories expires in 2022 (R. 18, Conan Doyle Mem. at 1), while Klinger asserts that the copyrights expires in 2023 (R. 1-2, Ex. B, Ten Stories). For the purposes of this declaratory judgment determination, it is only necessary to determine that the Ten Stories are still under valid copyrights, a fact to which both parties stipulate. (Conan Doyle's 56.1 Resp. ¶ 15.)

include character attributes that are under copyright protection, the Court cannot find that the Elements are in the public domain. (*Id.* at 4-5.)

Where an author has used the same character in a series of works, some of which are in the public domain, the public is free to copy story elements from the public domain works. *See* 1 *Nimmer on Copyright* § 2.12 (citing *Nat'l Comics Publishers, Inc. v. Fawcett Publ'ns, Inc.*, 191 F.2d 594 (2d Cir. 1951)) ("Clearly anyone may copy such elements as have entered the public domain, and no one may copy such elements as remain protected by copyright.") The Second Circuit's landmark case *Silverman v. CBS, Inc.* decided the copyright status of the radio scripts that created the "Amos 'n' Andy" characters from the eponymous radio broadcast and subsequent television program. The characters were created for radio in 1928, and the radio broadcast became one of the country's most popular programs. *Silverman*, 870 F.2d at 42. In 1948, the creators assigned their rights in the scripts that were already written (the "pre-1948 radio scripts") to CBS. *Id.* The radio programs continued until 1955. *Id.* In 1951, CBS also began broadcasting an "Amos 'n' Andy" television series that aired on CBS affiliate stations until 1953 and continued in syndication until 1966. *Id.* In 1981, Silverman began writing a script for a Broadway musical based on the "Amos 'n' Andy" characters, but CBS refused to grant Silverman a license to use the characters. *Id.* at 43, 50. The pre-1948 radio scripts had entered the public domain because the copyrights had not been renewed by the original creators of "Amos 'n' Andy." *Id.* at 43. Silverman filed a lawsuit seeking a declaration that the "Amos 'n' Andy" radio scripts were in the public domain, and thus he was free to make use of the characters, plots, and other content contained in the scripts. *Id.* The Second Circuit held that Silverman was free to use material from the pre-1948 radio scripts. *Id.* at 50. It further held that the "Amos 'n' Andy" characters had been sufficiently delineated in the pre-1948 radio scripts

such that they entered the public domain along with the pre-1948 radio scripts. *Id.* The Second Circuit found, however, that the "increments of expression" contained in the post-1948 radio scripts and television scripts that further delineated the characters and story were protected by CBS's copyright. *Id.* Therefore, Silverman would only infringe upon CBS's copyright if he copied the character and story elements that were introduced in the post-1948 radio and television scripts. *Id.*

Applying the rationale articulated in *Silverman* to Sir Arthur Conan Doyle's Canon, the district court in *Pannonia Farms, Inc. v. USA Cable*,[6] No. 03 CIV. 7841, 2004 WL 1276842 (S.D.N.Y. June 8, 2004), found that *only* the "increments of expression" added by the Ten Stories were protected by copyright. *Id.*, at *9. The district court clarified that "[s]torylines, dialogue, characters and character traits newly introduced by the [Ten Stories] are examples of added contributions susceptible to copyright protection." *Id.* It is a bedrock principle of copyright that "once work enters the public domain it cannot be appropriated as private (intellectual) property," and even the most creative of legal theories cannot trump this tenet. *Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 361 F.3d 434, 436 (7th Cir. 2004). Having established that all but the Ten Stories have passed into the public domain, this Court concludes that the Pre-1923 Story Elements are free for public use.

Conan Doyle argues that the effect of such a holding will be to dismantle Sir Arthur Conan Doyle's characters into a public domain version and a copyrighted version. (R. 28, Conan Doyle's Mem. at 7.) This is, however, precisely what prior courts have done. *Silverman* and *Pannonia Farms* instruct that characters and story elements first articulated in public domain

[6] The Court notes that neither the Conan Doyle Estate nor Klinger were parties to *Pannonia Farms*. Nonetheless, the Court finds the *Pannonia Farms* holding persuasive because of its factual similarity and cogent analysis of the case law.

works are free for public use, while the further delineation of the characters and story elements in protected works retain their protected status. *Silverman*, 870 F. 2d at 50; *Pannonia Farms*, 2004 WL 1276842, at *9. Conan Doyle argues that the precedent exemplified in *Silverman* should pertain only to two-dimensional, "flat" characters and not to complex, three-dimensional characters such as Sherlock Holmes and Dr. Watson. (R. 28, Conan Doyle's Mem. at 8-10.) Conan Doyle fails to offer a bright line rule or workable legal standard for determining when characters are sufficiently developed to warrant copyright protection through an entire series, nor does it provide any case law that supports its position. Conan Doyle's proposed distinction runs counter to prevailing case law. *See Siegel v. Warner Bros. Entm't Inc.*, 690 F. Supp. 2d 1048, 1058-59 (C.D. Cal. 2009) ("[T]he copyrightable aspects of a character . . . are protected only to the extent the work in which that particular aspect of the character was first delineated remains protected."); *see also Gaiman v. McFarlane*, 360 F.3d 644, 660 (7th Cir. 2004) (holding that once a comic book character was drawn, named, and given speech, it was sufficiently distinctive to be copyrightable). The effect of adopting Conan Doyle's position would be to extend impermissibly the copyright of certain character elements of Holmes and Watson beyond their statutory period, contrary to the goals of the Copyright Act. *See id.* at 661 (citing *Lee v. A.R.T. Co.*, 125 F.3d 580, 581–83 (7th Cir. 1997)); *see also Stewart v. Abend*, 495 U.S. 207, 228 (1990) ("The copyright term is limited so that the public will not be permanently deprived of the fruits of an artist's labors."). Accordingly, the Pre-1923 Story Elements are free for public use.

Conan Doyle and Klinger agree that a portion of the Sherlock Holmes Story Elements originated in post-1923 works, so the Court must now determine whether those elements are protected by copyright.

## III. Post-1923 Sherlock Holmes Story Elements

By Klinger's own admission, the Sherlock Holmes Story Elements include elements first introduced in the copyrighted Ten Stories (the "Post-1923 Story Elements"). (R. 1-1, Ex. A, Sherlock Holmes Story Elements.) The Post-1923 Story Elements pertain to the characters Dr. Watson and Sherlock Holmes and include: (1) Dr. Watson's second wife, first described in the 1924 short story "The Illustrious Client"; (2) Dr. Watson's background as an athlete, first described in the 1924 short story "The Sussex Vampire"; (3) and Sherlock Holmes' retirement from his detective agency, first described in the 1926 short story "The Lion's Mane."[7] (*Id.*) Conan Doyle argues that these elements are protected by copyright and their inclusion in Klinger's Sherlock Holmes Story Elements requires the Court to find that the Elements are not in the public domain. (R. 28, Conan Doyle's Mem. at 13.) Klinger contends that the Post-1923 Story Elements are events rather than characteristics of Dr. Watson and Sherlock Holmes and, as such, are not copyrightable. (Klinger's Rule 56.1 Resp. ¶ 6.) Klinger argues that any material first introduced in the Ten Stories does not complete the characters of Sherlock Holmes or Dr. Watson and therefore does not qualify for copyright protection. (R. 29-1, Klinger's Suppl. Decl. ¶ 3.) Courts do not distinguish between elements that "complete" a character and elements that do not; instead, the case law instructs that the "increments of expression" contained in copyrighted works warrant copyright protection. *See Silverman*, 870 F.2d at 50.

---

[7] In Conan Doyle's Rule 56.1 Statement of Additional Facts, it claims that Sherlock Holmes' retirement was introduced in the 1926 short story "The Lion's Mane," which is currently protected by copyright. (Conan Doyle's Facts ¶ 6(i).) Klinger did not dispute this fact. In Klinger's Sherlock Holmes Story Elements, however, he alleges that Sherlock Holmes' retirement was introduced in the 1917 short story "His Last Bow," which has entered the public domain. (R. 1-1, Ex. A, Sherlock Holmes Story Elements.) As discussed above, on a motion for summary judgment, the Court limits its analysis of the facts to the parties Local Rule 56.1 Statements. *See Bordelon*, 233 F.3d at 529. Because Klinger did not deny this factual statement, it is deemed admitted. Therefore, the Court will consider Sherlock Holmes' retirement as a Post-1923 Story Element.

The "increments of expression" test originates from the Copyright Act's discussion of the copyrightability of derivative works. *See Schrock v. Learning Curve Int'l. Inc.*, 586 F.3d 513, 518 (7th Cir. 2009) ("The Copyright Act specifically grants the author of a derivative work copyright protection in the incremental original expression he contributes as long as the derivative work does not infringe the underlying work."); *see also* 17 U.S.C. § 103(b) ("The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material.") In *Schrock v. Learning Curve International Inc.*, the Seventh Circuit stated that "the only originality required for a new work to be copyrightable is enough expressive variation from public-domain or other existing works to enable the new work to be readily distinguished from its predecessors." 586 F.3d at 521 (quoting *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 929 (7th Cir. 2003) (internal alterations and quotation marks omitted).

Thus far the cases in this Circuit have only applied the incremental expression test to derivative works. *See, e.g.*, *Schrock*, 586 F.3d 513; *Pickett v. Prince*, 207 F.3d 402 (7th Cir. 2000); *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191 (7th Cir. 1987). Conan Doyle argues that Sir Arthur Conan Doyle developed his characters throughout the entire Canon, and therefore no single work in the Canon is a derivative of another work. (R. 28, Conan Doyle's Mem. at 12.) A derivative work is defined as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. Professor Nimmer opines that after a character has been introduced in a work, subsequent works in a series

that feature the same character are derivative works. *See* 1 *Nimmer on Copyright* § 2.12. To support his proposition, Professor Nimmer cites to case law that adopts the position that sequels or series featuring the same character are derivative works. *Id.* § 2.12 n.23 (citing *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1112 (9th Cir. 1998) (user-created files based on copyrighted Duke Nukem computer game "are surely sequels, telling new . . . tales of Duke's fabulous adventures. A book about Duke would infringe for the same reason, even if it contained no pictures.")); § 2.12 n.23.1 (citing *Salinger v. Colting*, 641 F. Supp. 2d 250, 267 (S.D.N.Y. 2009) (holding that a novel that continues the story of *Catcher in the Rye* and its protagonist constitutes a derivative work), *vacated on other grounds*, 607 F.3d 68 (2d Cir. 2010)). In *Silverman*, the Second Circuit assumed without explicitly holding that the post-1948 scripts featuring the characters "Amos 'n' Andy" were derivative works in applying the incremental expressions test. *See Silverman*, 870 F.2d at 49 ("[C]opyrights in derivative works secure protection only for the incremental additions of originality contributed by the authors of the derivative works.") (citing 1 *Nimmer on Copyright* §§ 2.01, 3.04 (1988)). The *Pannonia Farms* court did not reach the issue as it pertains to the Canon, but nevertheless adopted the increments of expression test. 2004 WL 1276842, at *9 (holding that the increments of expression added by the Ten Stories to Sherlock Holmes, Dr. Watson, or any aspect of Sir Arthur Conan Doyle's pre-1923 stories are protected).

The Seventh Circuit has been silent on the issue of whether literary sequels or series constitute derivative works. In *Schrock*, the Seventh Circuit assumed without deciding that photographs of copyrighted materials were derivative works and consequently applied the increments of expression test to determine whether the photographs qualified for copyright protection. 586 F.3d at 518-19. Although the facts of *Schrock* do not arise in the context of literary works, the Court finds the principles enunciated in the holding to be instructive in the

instant case. In this case, similar to *Schrock*, the Canon consists of subsequent works that are based upon material from a pre-existing work, Sir Arthur Conan Doyle's first Sherlock Holmes story. The subsequent works in the Canon, including the Ten Stories, thereby meet the definition of derivative works. Therefore, the Court will assume for the purposes of this analysis, as the *Silverman* court did, that the Ten Stories are derivative works of Sir Arthur Conan Doyle's first Sherlock Holmes story. Accordingly, the Court will apply the increments of expression test to the Post-1923 Story Elements.

In *Pannonia Farms*, the district court defined increments of expression to include "[s]torylines, dialogue, characters and character traits newly introduced in the [Ten Stories]." 2004 WL 1276842, at *9. The Post-1923 Story Elements, Dr. Watson's second wife and his athletic background, as well as Sherlock Holmes' retirement, are a character, character trait, and a storyline, respectively. These elements originated in the copyrighted Ten Stories. (R. 1-1, Ex. A, Sherlock Holmes Story Elements.) On the record before the Court, there is substantial evidence that the Post-1923 Story Elements constitute "original expression" beyond what is contained in the public domain portion of the Canon. *Silverman*, 870 F.2d at 50. (*See* Conan Doyle's Facts ¶ 6(i)-(k); R. 27-1, Lellenberg Aff. ¶ 11; R. 27-2, Estlenman Aff. ¶ 14; R. 27-3, Fletcher Aff. ¶ 10.) The Court notes here that neither party has submitted any portion of the Canon for review by the Court, and at the summary judgment stage, the Court must make all reasonable inferences against the movant. Because the Seventh Circuit's incremental expression case law focuses on images rather than literature, it is difficult to apply its precedent seamlessly, but the Court finds that the low threshold of originality required for increments of expression counsels toward finding the Post-1923 Story Elements are copyrightable. *See Schrock*, 586 F.3d at 521 (quoting *Bucklew*, 329 F.3d at 929) ("the only originality required for a new work to be

copyrightable is enough expressive variation from public-domain or other existing works to enable the new work to be readily distinguished from its predecessors"). As a result, the Court finds that the Post-1923 Story Elements meet the increments of expression test as articulated in *Silverman* and *Pannonia Farms*.

Seeking to avoid this result, Klinger contends that the Post-1923 Story Elements are not susceptible to copyright protection because they are events, not characteristics. (Klinger's Rule 56.1 Resp. ¶ 6.) "Copyright protection does not extend to ideas, plots, dramatic situations and events." *Scott v. WKJG, Inc.*, 376 F.2d 467, 469 (7th Cir. 1967). The Post-1923 Story Elements, however, do not fit into any of the categories articulated by *Scott* and instead, as previously established, consist of a character, character trait, and storyline, which are copyrightable increments of expression. *See Pannonia Farms*, 2004 WL 1276842 at, *9. Klinger has failed to provide any evidence that the Post-1923 Story Elements are not susceptible to copyright protection, and the Court finds that the Post-1923 Story Elements are protected.

Klinger's motion for summary judgment rests on the following two propositions: (1) the Pre-1923 Story Elements are in the public domain and are thus available for public use, (R. 14, Klinger's Mem. at 5); and (2) the Post-1923 Story Elements are events that are not essential to the story or characters of Sherlock Holmes and Dr. Watson and therefore do not constitute incremental expression susceptible to copyright, (Klinger's Rule 56.1 Resp. ¶ 6). As the moving party on a motion for summary judgment, Klinger carries the initial burden of "establishing that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Even when no issue of material fact is present, the district court must make the further finding that given the undisputed facts, summary judgment is proper as a matter of law. *Wienco, Inc. v. Katahn Associates, Inc.* 965 F.2d 565, 568 (7th Cir. 1992) (citing

*Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989) (stating that in a summary judgment case "the district court must decide whether the movant has a good legal position")).

Klinger has met his burden as to his first proposition, but has failed as to his second proposition. Neither party has presented a genuine issue of material of fact.[8] The law is clear that Klinger is entitled to use the Pre-1923 Story Elements. The evidence presented to the Court as to this first proposition is "so one-sided" that Klinger must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52. As to his second proposition, however, Klinger's argument that he is entitled to judgment as a matter of law is unavailing and overcome by the relevant case law. The Post-1923 Story Elements are protected under copyright, and as a result neither Klinger nor the public are entitled to use them. Accordingly, the Court grants Klinger's motion as to the Pre-1923 Story Elements and denies it as to the Post-1923 Story Elements .[9]

## IV. Injunctive Relief

In addition to a declaratory judgment, Klinger seeks to enjoin Conan Doyle from further asserting its right under copyright law over the complete list of Sherlock Holmes Story Elements. (R. 1, Compl. at 16.) Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)). In deciding whether to grant preliminary injunctive relief, a court must consider four traditional criteria:

---

[8] Conan Doyle argues that the copyright status of the Sherlock Holmes character is a question of fact. (R. 28, Conan Doyle's Mem. at 7.) The Court, however, has already clarified that Klinger does not seek a judicial determination of the copyright status of the Sherlock Holmes character, however, and thus the Court does not address this issue.

[9] Conan Doyle requested an oral argument in this case. The Court has decided for the reasons set forth in this opinion that an oral argument is unnecessary.

> (1) whether the plaintiff has a reasonable likelihood of success on the merits; (2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (3) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and (4) whether the granting of the injunction will harm the public interest.

*Plummer v. Am. Inst. of Certified Pub. Accountants*, 97 F.3d 220, 229 (7th Cir. 1996). A preliminary injunction is provisional in nature, but a permanent injunction is a final judgment. *Id.* (citing *Walgreen Co. v. Sara Creek Prop. Co.*, 966 F.2d 273, 275 (7th Cir. 1992)). Klinger does not distinguish which type of injunction he seeks. Based on the complaint, however, it does not appear that Klinger is seeking a provisional order, but rather a permanent one. (*See* R. 1, Compl. at 16) ("[Klinger seeks] an Order enjoining Defendant and its agents and attorneys from further asserting rights under copyright in . . . the Sherlock Holmes Story Elements . . . and from interfering with the exploitation of the Sherlock Holmes Story Elements by Plaintiff. "). Therefore, the Court will consider whether a permanent injunction is appropriate in this case.

When the plaintiff is seeking a permanent injunction, the first of the four factors is slightly modified, as the issue is not whether the plaintiff has demonstrated a reasonable likelihood of success on the merits, but whether he has in fact succeeded on the merits. *See Chathas v. Local 134 Int'l Bhd. of Elec. Workers*, 233 F.3d 508, 513 (7th Cir. 2000) ("the predicate for a permanent injunction would have to be that they had prevailed on the merits . . . A plaintiff cannot obtain a permanent injunction merely on a showing that he is likely to win when and if the merits are adjudicated.") Here, although the Court has determined that Klinger is entitled to use the Pre-1923 Story Elements, Klinger requests an injunction barring Conan Doyle from asserting its copyright as to any of the Sherlock Holmes Story Elements. This request is broader than the relief Klinger is entitled to, and therefore, the Court must deny Klinger's request for injunctive relief.

## CONCLUSION

For the foregoing reasons, Klinger's motion for summary judgment (R. 11) is GRANTED in part and DENIED in part. It is granted with respect to Klinger's use of the Pre-1923 Story Elements and denied with respect to Klinger's use of the Post-1923 Story Elements. The Clerk of the Court is directed to enter a declaratory judgment in favor of Klinger only to the extent stated in this opinion.

**ENTERED:** [signature]

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: December 23, 2013**

**IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF ILLINOIS**

Leslie S. Klinger
Plaintiff(s)
v.
Conan Doyle Estate, Ltd.,
Defendant(s)

Case No. 13 C 1226

# JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff(s)
and against defendant(s)
in the amount of $ ,

which ☐ includes pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐ in favor of defendant(s)
and against plaintiff(s)

Defendant(s) shall recover costs from plaintiff(s).

---

☑ other: Declaratory judgment is entered in favor of the plaintiff, Leslie S. Klinger and against the defendant Conan Doyle Estate, Ltd. with respect to Klinger's use of the Pre-1923 Story Elements.

---

This action was *(check one)*:

☐ tried by a jury with Judge presiding, and the jury has rendered a verdict.
☐ tried by Judge without a jury and the above decision was reached.
☑ decided by Judge Ruben Castillo a motion for summary judgment

Date: 12/23/2013

Thomas G. Bruton, Clerk of Court
/s/ Ruth O'Shea, Deputy Clerk

**EXHIBIT A**
**SHERLOCK HOLMES STORY ELEMENTS**

- Baker Street Irregulars: Street urchins used by Holmes as his "eyes and ears." Mentioned only in *A Study in Scarlet*, *The Sign of Four*, and "The Crooked Man."
- Older brother Mycroft Holmes: Mentioned only in "The Greek Interpreter," "The Bruce-Partington Plans," "The Final Problem," and "The Empty House."
- Inspector Lestrade: Appears in 13 cases; only "The Three Garridebs" is not in public domain. Regularly drops in on Holmes ("The Six Napoleons"), bulldog-like (*A Study in Scarlet*), tenacious, determined ("The Cardboard Box"), practical ("The Boscombe Valley Mystery"), appreciates Holmes (*The Hound of the Baskervilles*).
- Mrs. Hudson: Appears in no stories in the *Case-Book* except "The Mazarin Stone," which was published in the United States prior to 1923 and thus in the public domain, and "The Three Garridebs." That is, of her dozens of appearances, only one is in a copyrighted story. No story provides a physical description other than having "queenly tread" ("The Naval Treaty"). Longest description of the relationship is in "The Dying Detective." She is an active figure in "The Empty House."
- Irene Adler: "The" woman to Holmes, mentioned only in "A Scandal in Bohemia," "A Case of Identity," "The Five Orange Pips," "The Blue Carbuncle," and "His Last Bow" (all in the public domain).
- Wiggins: Head of the Baker Street Irregulars—appears in *A Study in Scarlet* and does not appear in any *Case-Book* story.
- Professor Moriarty: The Napoleon of Crime. Appears as an actual character only in "The Final Problem," "The Empty House," and *The Valley of Fear*. The longest description is in *The Valley of Fear*. He is mentioned briefly in "The Norwood Builder," "The Missing Three-Quarter," "His Last Bow," and "The Illustrious Client," (the latter being in copyright).
- Colonel Sebastian Moran (right-hand man of Professor Moriarty): Appears only "The Empty House." He is mentioned in "The Illustrious Client" (in copyright) and "His Last Bow." A complete physical description appears in "The Empty House," as well as discussion of his history.
- Billy: the page boy at Baker Street appears in *The Valley of Fear*, "The Problem of Thor Bridge" and "The Mazarin Stone," all of which are now in the public domain.

As to Holmes himself:

- Birthdate, though never specified, is based on description in "His Last Bow"
- Family background ("The Greek Interpreter)
- Lodgings in Baker Street (virtually every story)
- Retirement ("His Last Bow," in public domain, and "The Lion's Mane," and "The Second Stain")
- Bohemian nature ("The Musgrave Ritual")
- Erratic eating habits ("The Norwood Builder")
- Schooling ("The 'Gloria Scott'" and "The Musgrave Ritual")
- Smoking ("The Devil's Foot" and countless other stories)

- Patriotic ("His Last Bow," "The Second Stain," "The Naval Treaty")
- Loner ("The 'Gloria Scott'")
- Drug use (many early stories; by the time of "The Missing Three-Quarter," he is described as an addict whose habit "is not dead, but merely sleeping")
- Fees ("Thor Bridge," "The Priory School," "The Final Problem," "Black Peter")
- Methods of reasoning—explained in many, many cases
- Aptitude for disguise ("Charles Augustus Milverton," "The Man with the Twisted Lip," "The Final Problem," "The Empty House," "A Scandal in Bohemia")
- Favorite weapon: loaded hunting crop ("A Case of Identity," "The Red-Headed League," "The Speckled Band," "The Six Napoleons")
- Amateur boxing skills ("The 'Gloria Scott,'" "The Yellow Face," "The Solitary Cyclist," *Sign of the Four*)
- Skill in baritsu (martial arts) ("The Empty House")
- Skill in chemistry (numerous stories)
- Physical appearance (many different aspects mentioned in various stories): Tall, thin, over 6 ft. tall, grey eyes, thin lips, hawk-like nose (all set out in *A Study in Scarlet*)

As to Dr. Watson:

- Army career (*A Study in Scarlet*)
- Courtship and marriage (*The Sign of Four*)
- Wound(s) (*A Study in Scarlet*, *The Sign of Four*, other stories)
- Second wife (only mentioned in copyrighted stories "The Illustrious Client" and "The Blanched Soldier")
- Schooling ("The Naval Treaty")
- Strongly built, thick neck, small moustache ("Charles Augustus Milverton")

uses the Holmes and Watson characters, but the creation of those literary characters continued and was completed in the ten stories Plaintiff admits are copyrighted. The characters are thus copyrighted until the last ten stories enter the public domain in 2022. (Lellenberg Aff., ¶ 10; Estleman Aff., ¶ 13; Fletcher Aff., ¶ 9.)

24. Plaintiff has incurred actual legal fees and expenses in the total amount of $17,272.25 through the date of signing of this Rule 56.1(a)(3) Statement and will incur additional expenses through the date of entry of final judgment on the merits, which Plaintiff will report to the Court. (Klinger Decl., ¶ 3.)

**RESPONSE:** Conan Doyle disputes the reasonableness and recoverability of Plaintiff's attorneys' fees, but that issue should be reserved for the conclusion of the case when the prevailing party is known. Conan Doyle has incurred attorneys' fees to date in an amount to be proven if Conan Doyle is the prevailing party.

## II
## CONAN DOYLE'S STATEMENT OF ADDITIONAL MATERIAL FACTS

1. Conan Doyle is a company owned by members of the family of Sir Arthur Conan Doyle. Conan Doyle's directors are Richard Doyle and Catherine Doyle Beggs, whose grandfather was Sir Arthur's brother Innes, and Richard Pooley, stepson of Sir Arthur's daughter Dame Jean Conan Doyle. (Lellenberg Aff., ¶ 11.)

### A. Both Holmes and Watson's Characters Are Continuously Created Throughout the Canon

2. Sherlock Holmes is perhaps the most famous character in modern literature. Part of the reason for his success and that of Dr. Watson is that while they are distinct and compelling from their first appearance, like real people they continue to develop and change throughout their fictional lives. In fact, the first two Sherlock Holmes novels, *A Study in Scarlet* and *The Sign of the Four*, made little impression upon the reading public; it was only after the characters were further developed in new short stories that the characters started to become widely recognized and followed. Holmes and Watson are not flat cartoon characters who simply go through a variety of scenarios. They are complex, constantly developing literary characters who continued to be revealed, to change, and to become more fully realized throughout all of Sir Arthur's stories about them. Their interests, likes

and dislikes, attitudes, habits of mind, and personalities were created continuously, but not in a linear fashion, by Sir Arthur over sixty stories, taking Holmes and Watson from young men in their twenties into their early sixties. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

3. The Holmes and Watson characters are each single works of authorship created throughout the Canon. Holmes's character was not complete with the first story, with 59 subsequent derivative variations as each successive story or novel was released. Holmes is a single individual who developed and changed in an organic way like a human person. Both his and Watson's arc as characters exist complete only in the entire Canon; no single published work or subset of the Canon can be considered derivative of any other subset. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

4. Sir Arthur did not develop Holmes's character in a strictly chronological way as the stories progressed. All of the last ten copyrighted stories are set in various points earlier in Holmes's life and reveal aspects of his character and background as a younger man. For this reason also it is not possible to split Holmes or Watson's characters into partial and full versions, or conclude that the characters are in the public domain up to a certain point in their fictional lives. It is also impossible for Plaintiff to take the Holmes or Watson characters at any given point in their fictional lives without invading character development created in the last ten copyrighted stories. Use of the characters as they existed at any particular time in their lives necessarily uses character development from copyrighted stories. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

5. For instance, "The Blanched Soldier" (1926) and "The Lion's Mane" (1926) are both set earlier in Holmes's career than stories previously written by Sir Arthur, but after Holmes and Watson parted ways in stories set in the fictional 1903. The remainder of the copyrighted *Case-Book* stories temporally are scattered among the earlier stories and their time-settings. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

6. The following are examples of dimensions and elements of Holmes's and Watson's characters created in post-1922 copyrighted stories:

a. Holmes softened and became more emotional over time, finally convincing himself in the copyrighted 1926 story "The Lion's Mane" that he needed "the soothing life of Nature." This dimension of Holmes's character is also developed in the copyrighted 1924 story "The Three Garridebs." When the story's villain fires a gun at Holmes and Watson, wounding Watson, Holmes says:

> "You're not hurt, Watson? For God's sake, say that you are not hurt!"
>
> It was worth a wound—it was worth many wounds—to know the depth of loyalty and love which lay behind that cold mask. The clear, hard eyes were dimmed for a moment, and the firm lips were shaking. For the one and only time I caught a glimpse of a great heart as well as a great brain. All my years of humble but single-minded service culminated in that moment of revelation.

This scene is of critical importance in understanding the two characters, the way Holmes changed, and the nature of his relationship with Watson over the years of their association, as discussed more fully next. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

b. Holmes's and Watson's relationship changes over the years, developing in the copyrighted stories into a truly close friendship. This maturing relationship cannot be quantified in a precise way in Holmes's character; it is a naturally changing dimension of his character shown in two copyrighted stories set at different points in Holmes's career:

In the 1926 story "The Blanched Soldier," Holmes must narrate the case himself because Watson is no longer his collaborator: Watson has remarried, moved out of Baker Street, and renewed his career as a doctor elsewhere. "Blanched Soldier" shows an earlier development in Holmes's and Watson's relationship, when Holmes calls Watson's remarriage "the only selfish action which I can recall in our association. I was alone."

"The Three Garridebs" (1924), on the other hand, quoted above, reveals the pinnacle of Holmes's and Watson's friendship in a copyrighted story. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

Plaintiff Klinger himself has written of this progressive character development revealed in copyrighted stories. In his *New Annotated Sherlock Holmes* (W.W. Norton 2004) (hereafter *NASH*), published under license from Conan Doyle, Plaintiff writes of "The Three Garridebs": "Holmes expresses a moving concern for Watson's safety. Perhaps as a sign of Holmes's age (48) or his impending retirement in 1904 [sic], Holmes's and Watson's relationship has grown from that of mere flat-mates in 1881 to the closest of friendships." (*NASH* at 1581.)

Plaintiff also admits that Holmes's relationship with Watson is further developed in the copyrighted story "The Retired Colourman" (1926), as "Watson seems pleased to recollect his active partnership with Holmes." (*NASH* at 1730.) The story also introduces "Holmes's 'hated rival on the Surrey shore' (of whom we have heard nothing before)." (*Id.*) (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

c. Holmes grows from someone who cares little for dogs to someone with such great interest in them and their relationship to humans that, in the copyrighted story "The Creeping Man" (1923), Holmes intends to write a monograph on the subject. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

Plaintiff writes of this copyrighted story: "Holmes's attitude toward dogs has changed markedly from his cold (but not cruel) dog poisoning in *A Study In Scarlet*. Now Holmes sees dogs as the mirror of their household, and he even plans a monograph on the topic." (*NASH* at 1636.)

d. Holmes's character takes on a darker cast in the last collection of stories—and this too became part of who Sherlock Holmes is. He became less racially tolerant in a 1926 copyrighted story, for example. Plaintiff Klinger writes about this development in "The Three Gables" (1926): "Holmes's sarcastic remarks to Steve Dixie, certainly racist by modern standards, display an attitude markedly different from his evident racial tolerance on view in "The Yellow Face," an 1893 story." (*NASH* at 1534.) (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

e. It becomes clear from 1926 copyrighted story "The Blanched Soldier" that Holmes has acquired over time a knowledge of medicine, whereas previously he relied on Dr. Watson, absent from this story, for such guidance. Plaintiff writes of this story that it "demonstrates Holmes's knowledge of medicine rather than his detective skills," a new development in the character of Sherlock Holmes. (*NASH* at 1482.) (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

f. The copyrighted stories "The Sussex Vampire" (1924), "The Illustrious Client" (1924), and "The Creeping Man" (1923) reveal for the first time that Holmes has converted his practice into an "Agency" after Dr. Watson moved out of Baker Street. Holmes's Agency employs various informants and a "general utility man" named Mercer "who looks up routine business" for the Agency. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10; *NASH* at 1449, 1555, 1636.)

g. Holmes embraces modern technologies for the first time in copyrighted stories, revealing that he kept current with technological change and adopted it in his practice. Sir Arthur introduced telephones at 221B Baker Street in "Illustrious Client" (1924), "Three Garridebs" (1924), and "Retired Colourman" (1926), along with telephone directories in two of these stories. In another copyrighted story, "Shoscombe Old Place" (1927), Holmes pioneers "the use of the microscope as an investigative tool," in Plaintiff's words, and in "The Lion's Mane" (1926), Holmes employs photographic analysis for detection, which Plaintiff concedes was "not

previously mentioned among the various techniques Holmes employs throughout the Canon." The same copyrighted story brings Holmes into contact with the "wireless" radio, another piece of technology that did not exist for some decades when the Sherlock Holmes stories were new. (*NASH* at 1449, 1581, 1730, 1707, 1667; Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

h. In "The Sussex Vampire" (1924), we first find out about "Holmes's great index," a reference tool of his own invention with references also to such unrecorded cases of his as Victor Lynch, the forger; the giant rat of Sumatra, "a story for which the world is not yet prepared"; Vanderbilt and the Yeggman; Vittoria the Circus Belle; and Vigor, the Hammersmith Wonder." Each of these were mentioned in the copyrighted "Sussex Vampire" story with details noted in "Holmes's great index," compiled over many years but revealed for the first time in this 1924 *Case-Book* story. (*NASH* at 1555.) (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

i. Holmes's famous retirement is depicted only in the 1924 copyrighted story "The Lion's Mane." From this story we learn that Holmes has given up his detective Agency, is no longer living in London, and has moved to the South Downs of Sussex, where he lives quietly keeping bees and writing about nature subjects. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

Plaintiff admits that this copyrighted story "is the Canon's only depiction of Holmes's retirement. July 1907 sees Holmes in residence in Sussex, and the story gives many clues as to the location of Holmes's last known home (where readers long to believe he still lives). Maud Bellamy, whose fiancée is the victim of the alleged crime, is a singularly attractive figure, and some suggest that Holmes had 'feelings' for her, something at great variance with Sherlock Holmes's earlier notorious misogyny about which Dr. Watson remarked repeatedly in earlier stories." (*NASH* at 1667.)

j. Watson's character is also created and developed in copyrighted stories—and Plaintiff's own Ex. A list of character traits acknowledges this. Two out of the seven Watson character traits Plaintiff lists in his Ex. A are from admittedly copyrighted stories. First, Watson's second marriage and departure from the Baker Street flat comes from two copyrighted stories, "The Illustrious Client" (1924) and "The Blanched Soldier" (1926), as Plaintiff acknowledges. (Compl., Ex. A, at 2.)

What Plaintiff does not acknowledge is the significance of this development in developing Watson's character and altering his relationship with Holmes. As a result of Watson's second marriage and move, Holmes instead of Watson is required to narrate two cases, one prior to his retirement from active practice ("The Blanched Soldier," 1926), and the other well into Holmes's Retirement, "The Lion's Mane" (1926). The implications of Watson's second marriage are significant for his character and background, including even leading some scholars to surmise Watson married not only twice but as many as five times, starting before he and Holmes ever met. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

k. Second, Watson's background as a former athlete is revealed only in the copyrighted 1924 story "The Sussex Vampire," reflecting new light back onto his character in his younger years. Again, Plaintiff's own description of Watson's supposedly public domain character admits that this dimension of Watson's character is created in a copyrighted story. (Compl., Ex. A, at 2.)

Plaintiff writes elsewhere about "Sussex Vampire" (1924) that it contains the only "[r]eferences to Watson's youth, when he played rugby for Blackheath." (*NASH*, at 1555; Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

l. The 1927 story "Shoscombe Old Place" also reveals that among Dr. Watson's habits is a serious over-fondness for horse-racing, which he pays for with "half my wound pension." This is the last Holmes story Sir Arthur wrote, but like all the *Case-Book* stories, it is set earlier in Watson's life. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

These are broad outlines of developments in Holmes and Watson's characters in the Ten Stories. A great many finer details of character development can be identified as one reaches greater levels of specificity in the copyrighted Ten Stories. In addition, the foregoing list is not intended to identify all protected material in the Ten Stories; it makes no effort to identify copyrighted dialogue, settings, plots, new characters, or other story elements in the Ten Stories beyond Holmes and Watson's characters. (Lellenberg Aff., ¶ 11.)

## B. Holmes Is Different From Cartoon or Flat Characters but in the Company of a Great Many Significant Literary Characters in Modern Fiction

7. While the author of the Holmes and Watson characters continued to create their characters throughout his series of stories about them, the same is often not true of flat or cartoon characters in a series. A cartoon character is generally complete in the first—or perhaps first few—stories about him or her. A cartoon character is then put into new scenarios without the character itself continuing to develop or take on further dimension. The Harper Handbook of Literature defines a flat character as "a character that is two-dimensional, without the depth and complexity of a living person; the opposite of a round character" (195). The characters Amos and Andy from the eponymous series of radio plays are a classic example of "flat characters;" they never change—

merely find themselves in different situations that bring about changes in dialogue, not character. Readers look to many works of popular entertainment for reassurance that the world works exactly as they think it does. It is crucial in such flat works that characters do not alter dramatically. In literary fiction, by contrast, characters continue to develop, frequently upsetting or surprising a reader's expectations. (Woiwode Aff., ¶¶ 9, 10; Sayers Aff., ¶¶ 5-7.)

8. A serious literary character continues to be formed and takes on further attributes and dimensions through every story about that character. In addition to Sherlock Holmes, many other significant literary characters have been developed by their authors over a series of works, including iconic fictional characters in works by William Faulkner, Philip Roth, John Updike, John Cheever, Larry Woiwode, Valerie Sayers, P.D. James, and Loren Estleman. The creation of a substantial character throughout multiple works is a reality of some of the world's great literature going back at least to Sophocles's *Oedipus* trilogy. If a rule were imposed that a character in a series is completely created in the first work in that series, such a rule would fit the creation of cartoon characters and of many flat characters in entertainment series, in which the characters are complete in the first work and simply go through varying scenarios and dialogue. But such a rule would do violence to the creation of dimensional literary characters over a series of works in which authors continue to develop, expand, mature, and change the characters until the end. Such a rule applied to literary characters without looking to see where the actual development of the character ends would dismantle characters into fragments that their authors did not create. (Woiwode Aff., ¶¶ 6–17; Sayers Aff., ¶¶ 5–11.)

9. To say that a character is fully created in one book when the author has continued that character's creation in later books is equivalent to saying that a character in a novel is complete in the first chapter, or that a fully-developed person is present at birth. Such statements are at odds with reality if an author created the character over a series of chapters or books—just as most

people continue to change and be forged as they move through life. (Woiwode Aff., ¶ 9; Sayers Aff., ¶ 6; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

10. Moreover, even when a literary character is created by an author in a series of chapters, stories, or books, that character is a single creation. The various stories and books about him do not contain so many "derivative" or "variant" versions of the character. A literary character is not divisible, though it has many dimensions—like any other person's character. To attempt to dismantle a literary character like Sherlock Holmes is not only impossible as a practical matter, but would ignore the reality that Sir Arthur Conan Doyle created a single complex Sherlock Holmes complete in sixty stories. (Woiwode Aff., ¶¶ 12, 17; Sayers Aff., ¶ 6, 12; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

**C. Plaintiff's *Study in Sherlock* Made Use of Copyrighted Story Elements Beyond the Holmes and Watson Characters**

11. *A Study in Sherlock*, the short story collection Plaintiff co-edited in 2011, was published under license from Conan Doyle, although Plaintiff contended then and contends now that his book used only the portion of Sherlock Holmes's character from public domain stories. In fact, at least four of the sixteen stories in *A Study in Sherlock* used clear story elements from copyrighted *Case-Book* stories:

- "You'd Better Go in Disguise," by Alan Brady, refers to wireless radio, to alienist psychology and Sigmund Freud, elements from the *Case-Book* stories "Creeping Man" (1923), "Sussex Vampire" (1924), and "Lion's Mane" (1926), and to Simpson's, the actual London restaurant where Holmes and Watson dine in "Illustrious Client" (1924).

- "As to an 'Exact Knowledge of London,'" by Tony Broadbent, has Holmes and Watson using electronic apparatus of the 20th and 21st centuries, including the wireless radio ("Illustrious Client", 1924), and uses Holmes's new life as a bee-keeper ("The Lion's Mane" (1926)), which Plaintiff in *The New Annotated Sherlock Holmes* calls "the Canon's only depiction of Holmes's retirement," as well as the unrecorded case of the Politician, the Lighthouse, and the Trained Cormorant from "The Veiled Lodger" (1927).

- "The Startling Events in the Electrified City" by Thomas Perry has Holmes speaking about "the wonders of electricity," not present in Baker Street until the *Case-Book* stories "Illustrious Client" (1924), "Three Garridebs" (1924), and "Retired Colourman" (1926) in a

plot that relies upon Dr. Watson's second marriage and new medical practice from "Blanched Soldier" (1926). The story concludes with an explicit reference to the *Case-Book* story "Sussex Vampire" (1924).

• "The Case of Death and Honey" by Neil Gaiman dives deep into Sherlock Holmes's Sussex bee-keeping life described in "The Lion's Mane" (1926), as Plaintiff points out himself in an editorial afterword to the story, and also refers to another copyrighted *Case-Book* story, "The Creeping Man" (1923).

(Lellenberg Aff., ¶ 11.)

## D. What Is Known of Plaintiff's Second Short Story Collection Also Clearly Invades Copyrighted Stories

12. Plaintiff has begun co-editing a new short-story collection tentatively entitled *In the Company of Sherlock Holmes* as alleged in his Complaint at ¶¶ 3, 27–34. Conan Doyle learned of the proposed new book when one of the writers invited to contribute to it, the literary historian and critic Michael Dirda, informed Conan Doyle that he intended to use Sir Arthur's fictional character Langdale Pike, originating in the copyrighted 1926 *Case-Book* story "The Three Gables," in his story for Plaintiff's new book. (Lellenberg Aff., ¶ 11.)

SUTIN THAYER & BROWNE
A Professional Corporation

By______________________________
Benjamin Allison
Tracy Hofmann
Lynn Mostoller
317 Paseo de Peralta
Santa Fe, New Mexico 87501
(505) 988-5521
Fax: (505) 982-5297

*Counsel for Conan Doyle Estate Ltd.*